## PIEDMONT PRINT WORKS, Inc., et al. v. RECEIVERS OF PEOPLE'S STATE BANK OF SOUTH CAROLINA.

## KRUPNICK v. PEOPLE'S STATE BANK OF SOUTH CAROLINA et al.

### No. 3527.

Circuit Court of Appeals, Fourth Circuit.

Jan. 4, 1934.

H. J. Haynsworth, of Greenville, S. C. (C. F. Haynsworth, of Greenville, S. C., on the brief), for appellants.

E. M. Blythe, of Greenville, S. C. (P. A. Bonham, of Greenville, S. C., and Benet, Shand & McGowan, of Columbia, S. C., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

Piedmont Print Works, Inc., and Southern Bleachery & Print Works, Inc., filed a joint petition in the District Court in the receivership proceedings of the People's State Bank of South Carolina, an insolvent bank, asking that a portion of the deposit of Piedmont Print Works, Inc., in the bank, amounting to $12,331.71, be set off against a note of Southern Bleachery & Print Works, Inc., in the sum of $5,000 held by the bank. The petition was resisted by the receivers, and was dismissed by the District Judge after the submission of certain evidence now to be summarized.

The bank had business relations with three closely associated Delaware corporations. Piedmont Print Works, Inc., which for convenience may be called the "Print Works," and Southern Bleachery, Inc., which will be referred to as the "Bleachery," had for some years prior to July, 1930, been engaged in business in Taylors, S. C. Their interests were closely allied as the business of the Bleachery was bleaching, dyeing, and finishing cotton goods, and the Print Works was engaged in printing cotton goods. Furthermore, the control of the common stock of both corporations was in the same hands, and they had common boards of directors, or nearly so. In July, 1930, the Print Works was in financial difficulties and was thought to be in need of additional machinery. In order to supply its needs, a third Delaware corporation, to wit, Southern Bleachery & Print Works, Inc., was formed in September, 1930, as a holding company, and it will be hereinafter referred to by that designation. It was intended that this company should eventually acquire all of the property of the Print Works and the Bleachery, and should carry on these businesses as a single unit; and to that end, it did acquire stock of these companies, in exchange for its own stock, in certain proportions, until at the time of the hearing below, it had acquired 97.6 per cent. of the stock of its subsidiaries. It remained, however, a purely holding company, doing no active business and having no source of income save that derived from its ownership of the stock of its subsidiaries. The three corporations, although having common officers and common directors with one or two exceptions, existed as separate legal entities.

In June, 1930, prior to the incorporation of the holding company, the Print Works had entered into an agreement with the South Carolina National Bank and the People's State Bank of South Carolina, the bank in this case, whereby it was stipulated that the Print Works should borrow $175,000 from the former and $100,000 from the latter bank, and should maintain with each bank, as nearly as possible, balances amounting to 20 per cent. of the amount under discount, and in any event should maintain balances with each bank in the ratio of 175 to 100. Such balances were in fact maintained. When the

holding company was formed, it was decided that it should assume a large part of the indebtedness of the Print Works, including the $275,000 owed to the banks. Accordingly, the holding company issued $648,000 in gold notes for various items of the Print Works' indebtedness, and took similar notes of corresponding amounts from the Print Works. Both banks took the holding company's gold notes in discharge of the indebtedness of the Print Works. The banks knew that corresponding notes, as above stated, were given by the Print Works to the holding company, and that the holding company expected to pay its notes with the proceeds of the notes of the Print Works, as it had no assets except the stock of its subsidiaries.

Upon this evidence, the District Court made the ultimate findings of fact that when the gold notes of the holding company were issued and delivered to the People's State Bank, the Print Works was discharged of its obligation of $100,000 to the bank, and the holding company became a debtor to the bank in the same amount; and that the holding company had no interest in the deposit which, at the closing of the bank, stood in the name of and belonged to the Print Works. Hence it was held that there was no mutuality of claims between the bank and the holding company, and that therefore this corporation had no right to set off the amount of the deposit against its indebtedness to the bank. It was said that although the Southern Bleachery and Print Works was merely a holding company for the stock of the subsidiaries, still the corporations were distinct legal entities, and that there were no such circumstances as would justify the court in ignoring the separate corporate structures and declaring that the three corporations were practically one and the same. To do so, it was said, would enable the Print Works to get a priority of payment over other depositors of the insolvent bank. The new arrangement, whereby the holding company executed its notes and became a debtor of the bank in place of the Print Works, was held to constitute a novation of debtors, and the right to set off the deposit of the old debtor against the debt of the new was denied.

There is much to be said for this analysis and it might well prevail, were it not for another circumstance to which, as we view it, the District Court did not give sufficient weight. It was shown by the testimony of witnesses for both sides, which was in no way challenged or denied, that parallel with the substitution of one corporation for the other

as debtor to the bank, there was an additional understanding or agreement. This provided that the former arrangement between the Print Works and the bank in regard to the maintenance of a deposit as against the indebtedness to the bank should be continued; and in fact the bank recognized this situation by a letter of January 29, 1931, subsequent to the exchange of the notes, in which it called upon the Print Works to maintain its deposits at the agreed ratio. Such a demand indicated that the bank recognized the substantial identity of the two corporations so far as this transaction was concerned, and required the continuance of the old agreement as to deposits, so that, if the holding company should fail to pay its notes, the bank would be able to exercise the usual right of a banker to apply the deposit of a customer to the payment of his loans in default. If there had been no novation, either in form or in substance, it would have been the right of either party to the old arrangement between the Print Works and the bank to offset against the amount it owed, such sums as the other party might owe to it, and this right would have existed in favor of either party, if the other had failed through financial inability to meet its obligation. The uncontradicted testimony shows that a maintenance of the *same* arrangement was agreed upon, and hence the same mutuality of rights and obligations must have been contemplated. On the one side, the Print Works subjected its deposit to seizure by the bank in case the holding company should make default on its notes, and on the other, the holding company was entitled to a corresponding right of offset, if the bank should make default in its obligations to its depositors.

The identity of interest between the holding company and its subsidiary sustains this conclusion, and furnishes the motive for the willingness of the Print Works to maintain its deposit against the holding company's debt. Similarly, the knowledge of the bank that the notes held by it could be paid only from the revenues of the active business led it to treat the situation as one involving those mutual obligations which arise when a depositor in a bank becomes a borrower of its funds. A very similar situation was considered by the Circuit Court of Appeals of the Tenth Circuit in Bromfield v. Trinidad Nat. Inv. Co., 36 F.(2d) 646, 71 A. L. R. 542, where it was held that a receiver of an insolvent bank, suing upon notes owing to it by an investment company, must allow as a set-off a deposit made by another bank of which the

112

investment company was a subsidiary. The decision was based upon the finding of fact that the transaction between the parties indicated an agreement whereby the insolvent bank, as the holder of the subsidiary's notes, had the right to charge them against the deposit of the principal corporation, and that this right carried with it a reciprocal obligation to credit the notes with the deposit when the bank failed.

Such was in effect the agreement in the case at bar, and the judgment of the District Court must therefore be reversed, and the case remanded for further proceedings in accordance with this opinion.

Reversed and remanded.