In the Matter of BERGER STEEL COMPANY, Inc., Debtor.

INLAND STEEL COMPANY, Appellant,

v.

BERGER STEEL COMPANY, Inc., Appellee.

No. 14236.

United States Court of Appeals Seventh Circuit.

Jan. 17, 1964.

Edward R. Lev, Chicago, Ill., Charles M. Reed, East Chicago, Ind., Herbert A. Friedlich, George W. Hamman, Chicago, Ill., for appellant, Inland Steel Co., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Charles B. Feibleman, Gene E. Wilkins, Indianapolis, Ind., Bamberger & Feibleman, Indianapolis, Ind., of counsel.

Before HASTINGS, Chief Judge, and KNOCH and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

Berger Steel Company, Inc., the debtor here, initiated proceedings for an arrangement under Chapter XI of the Bankruptcy Act (11 U.S.C. § 1 et seq.). The debtor (hereinafter sometimes called "Berger Steel") was authorized to remain in possession of its property as a debtor-in-possession.

Berger Steel petitioned the United States District Court to set aside an alleged preference of $54,761.64 received by Inland Steel Company, the appellant here (hereinafter sometimes called "Inland") from Joseph T. Ryerson & Son, Inc., a wholly-owned subsidiary of Inland (hereinafter sometimes called "Ryerson").

Inland in its answer to the debtor's petition to set aside the alleged preference asserted that the sum was retained pursuant to § 68 of the Act as a set-off. Section 68 (11 U.S.C. § 108) provides:

"a. In all cases of mutual debts or mutual credits between the estate

of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of section 93 of this title; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy."

On the basis of stipulated facts, documentary exhibits, and oral testimony, the Referee in Bankruptcy made certain findings of fact which were affirmed by the District Court. Briefly the situation was as follows:

Inland and its wholly owned subsidiary Ryerson, both Delaware corporations, with principal places of business in Chicago, Illinois, have been doing business with Berger Steel for some time. In March 1962, Berger Steel owed Inland in excess of $77,000 for steel sold and delivered. Berger Steel had manufactured and produced for Ryerson merchandise having an approximate value in excess of $125,000. Ryerson had approved for payment invoices in the total sum of $96,121.78. The balance was still at Berger Steel's plant awaiting delivery.

The purchase orders from Ryerson to Berger Steel consisted of two documents, one marked "original purchase order" and the other marked "vendor acknowledgment copy." Terms and conditions of the order were set out on the reverse side of this second document which was to be signed by Berger Steel. However, only the first document which was not signed by Berger Steel contained the following:

Any money due for materials furnished hereunder may, at our option, be applied by us to the payment of the sums which you or any of your affiliated or subsidiary companies may owe to us or to any other subsidiary company of Joseph T. Ryerson & Son, Inc. or to its parent company; the Inland Steel Company.

Although this document was never signed by Berger Steel, Berger Steel did perform contracts for Ryerson under the terms of purchase orders submitted in the form of these two documents.

Sherman B. Hoyt, assistant credit manager for Inland, testified that early in November 1961, Berger Steel's president, Sidney L. Berger, telephoned him to tell him that arrangements had been made whereby Ryerson would be placing substantial orders with Berger Steel for steel joists. Mr. Hoyt described their conversation as follows:

"I also indicated that in view of this, very likely the Berger Steel Company would be placing additional orders with the Inland Steel Company and as a result of that we would have an increased credit exposure on the Berger account.

"Mr. Berger then told me that this should not be any problem, as he was familiar with the set-off clause in the Ryerson purchase order."

I told him that I was familiar with that provison. Pursuant to Inland's established practice, Mr. Hoyt prepared a contemporaneous memorandum of the conversation which was an exhibit in the District Court.

Inland did ship Berger Steel additional steel, bringing Berger Steel's indebtedness to Inland to the figure stated above. Inland asserts that the additional shipments would not have been made but for the protection of the set-off language in the Ryerson purchase order and Mr. Berger's agreement that Inland might rely on it. On November 7, 1961, Inland's credit representative James Marzano wrote Ryerson's accounts payable department instructing them to contact him before issuing any checks to Berger Steel. Inland shipped about $30,000 worth of steel to Berger Steel in Novem-

ber 1961, and about the same quantity in January 1962.

On March 15, 1962, Inland asked Ryerson to remit to Inland the sum Ryerson owed Berger Steel. On March 19, 1962, Ryerson sent Inland $54,761.64, the sum sought to be recovered as a voidable preference, pursuant to § 60 of the Act (11 U.S.C. § 96), notifying Berger Steel that the payment had been made. Berger Steel initiated proceedings in the Bankruptcy Court on March 28, 1962.

There was evidence that Berger Steel was insolvent on March 19, 1962. Mr. Hoyt testified to numerous prior calls and a visit to Berger Steel in an effort to collect the sums owed to Inland. Two of Berger Steel's checks to Inland were dishonored prior to March 19, 1962. On February 16, 1962, when Mr. Berger asked for an extension of time to pay Inland, Mr. Hoyt testified that he said Inland would have to rely on the Ryerson set-off. As of March 10, 1962, Inland was requesting cash in advance on material sold to Berger Steel.

As early as May 1961, Berger Steel had pledged all its accounts receivable to James Talcott, Inc. (hereinafter sometimes called "Talcott") pursuant to a financing agreement. By June 12, 1961, Inland knew of that agreement.

Mr. Marzano testified to a telephone conversation with Mr. Berger on March 6, 1962, in which he said that the latter agreed verbally to "contra" the account or to reduce the amount owing Inland by setting off amounts owed to Berger Steel by Inland or a third person. Mr. Marzano's contemporaneous memorandum of this conversation reads:

Sid Berger phoned.

He stated he needed more rounds shipped. He could not mail any payments against his account. He understood that we are to set off the Ryerson account of which there was approximately $100,000 billed.

I indicated we would do this and hold any amounts available against the account, that we were only going to ship material to Berger based on

the amount of contra security that was available.

Berger again indicated he understood this and was delivering 4 truckloads to Ryerson covering material against the Container job.

I agreed to release two trucks of rounds against this arrangement.

Mr. Marzano testified further that he asked (and was promised) that Mr. Berger would send a written confirmation of this agreement to Ryerson, but no written confirmation was ever sent.

There was a conflict in the evidence on this crucial point. Sidney Berger testified that on February 16, 1962, he had told Mr. Hoyt and Mr. Marzano that Inland could not exercise the set-off option in "the small print" of the Ryerson purchase orders because the accounts had all been assigned to Talcott. Mr. Hoyt testified that he told Mr. Berger to straighten that matter out with Talcott, immediately because he assumed that the Ryerson set-off took precedence. Neither Berger Steel nor Inland served notice of these set-off provisions on Talcott. Inland's position is that Talcott should have examined the documents on which its security rested and that no equities in favor of Talcott can arise from its ignorance of the provisions in the Ryerson purchase orders.

Mr. Berger testified that he did not advise Talcott of the set-off provisions because both Ryerson and Inland knew of the "100% blanket assignment" to Talcott and because no attempt had been made by Ryerson to exercise any option.

As to the conversation of November 1961, Mr. Berger testified that he did not intend Mr. Hoyt to interpret his remarks as indicated in the memorandum of the conversation made by Mr. Hoyt, because they both knew of the prior assignment to Talcott.

The parties agree that Inland and Ryerson are separate corporate entities and that a debt owed to a parent and a debt owed by the subsidiary to the debtor are not "mutual" within the meaning of § 68.

of the Act, which provides for set-off of *mutual* debts and credits.

Inland argues however, that set-off is an equitable doctrine of convenience and where a debtor has treated the parent and subsidiary as one for the purpose of providing additional security by way of set-off for credit which would not otherwise have been extended, the debtor cannot later assert that parent and subsidiary are separate entities to preclude mutuality of debts and credits.

Inland asserts that the evidence shows a tripartite agreement among Inland, its wholly owned subsidiary, Ryerson, and Berger Steel, to permit a set-off in order to induce a further extension of credit.

The Referee found (and the District Court affirmed his finding) that no equitable set-off did arise in favor of Inland with respect to the Ryerson account because Inland knew of the prior financing arrangement with Talcott.

Resolving certain conflicts in the evidence in favor of the debtor and drawing inferences favorable to the position of the debtor, where a choice of inferences is presented by the evidence, the District Court found that Inland did not in fact rely on the unsigned set-off provisions in the Ryerson purchase orders or the alleged oral representations of Mr. Berger, which the District Court thought were inconsistent with the latter's failure to issue the subsequently requested written authorization. The District Court recounts various other ways in which Inland attempted to collect the sums due from Berger Steel directly.

However, in the light of the contemporaneous memoranda internally issued at Inland with their frequent reference to the Ryerson set-off provisions, we find it incredible that, whatever alternative methods of collection were simultaneously pursued, Inland was not at least in part relying on the Ryerson set-off. Inland does not rely on the unsigned provisions of the Ryerson purchase orders alone, but on the alleged verbal agreement on the basis of which, Inland official testified, additional credit was extended.

In discussing the equities of Inland's position, the District Judge noted that Inland, having for presumably good reasons, chosen to conduct its operations by establishing Ryerson as a separate corporation, was now seeking the advantages of an alternative method of operation which it had deliberately failed to choose.

The Referee failed to find any such tripartite agreement, as Inland asserts, to the effect that Inland could rely on the Ryerson optional set-off provisions. The District Court held that the absence of such a finding was not clearly erroneous under the evidence presented. Inland contends that the District Court has disposed of Inland's key contention by affirmance of a finding which the Referee never made. We do not think this is an accurate characterization of the District Court's action.

The Referee did find a lack of mutual debts and credits between Berger Steel and Inland; he found that Inland and Ryerson were separate corporate entities and that there was no basis for disregarding those entities; that the language of the Ryerson purchase orders referred to application of the moneys due from Ryerson at Ryerson's option only; that no written assignment of the Ryerson accounts receivable was ever given to Inland, whereas a prior written assignment of all accounts receivable had been given to Talcott for a valuable consideration. The Referee concluded that Inland was not entitled to a set-off. It is thus clear that the Referee found no existent tripartite agreement such as Inland presumed had been made.

 As indicated, there was a conflict in the testimony. The written memoranda on which Inland relies represent the understanding of Inland's credit personnel as to the purport of the conversations with Mr. Berger. His own account of these conversations is quite different. On direct examination, he flatly denied

any such agreement had been made. On cross-examination, he did say:

> "I believe that Mr. Hoyt could have interpreted the conversation in that manner."

but he also said:

> "I did not intend to have him interpret the conversation in the manner that would mean that Inland * * * would have the absolute right of set off, since at that time I knew all accounts still had to be assigned to James Talcott and Inland knew this and Ryerson knew this."

Mr. Berger was testifying apparently from his personal recollection without the aid of any contemporaneous written memoranda such as produced by Inland's credit personnel. However, whatever impressions we may now derive from our study of the printed record, the Referee saw and heard these witnesses. It is axiomatic that issues of credibility are for the triers of the facts. The findings of fact made by the Referee and by the District Court are entitled to great weight on review. General Orders in Bankruptcy, Nos. 36 and 47; In re United Wholesalers, Inc., 7 Cir., 1960, 274 F.2d 316, 319; In re Pringle Engineering & Mfg. Co., 7 Cir., 1947, 164 F.2d 299, 301.

■ Inland contends that the evidence clearly establishes that Mr. Berger agreed that Inland could offset the Ryerson account and that it was clearly to his interest to treat Inland and Ryerson as one entity because otherwise he would not have received any steel to fill the Ryerson orders. But there was a conflict in the oral testimony. It is our considered view that we cannot say it was clearly erroneous not to have found that a tripartite agreement was made as Inland contends.

We have carefully considered the cases to which Inland has invited our attention.

In Piedmont Print Works v. Receivers of People's State Bank, 4 Cir., 1934, 68 F.2d 110, it was held that a holding company could set off, against what it owed the insolvent Bank, the deposits maintained in that Bank by the subsidiaries of the holding company. The Bank had agreed to lend $100,000 to the corporation which later became the subsidiary of the subsequently formed holding company, which assumed the debt of the subsidiary and issued new notes to the Bank to secure repayment. The subsidiary continued to maintain at the Bank the deposit which it had agreed to maintain. The Court in Piedmont found, however, that the testimony of the witnesses for both sides showed that there was an additional understanding or agreement parallel with the substitution of the holding company for the subsidiary as debtor to the Bank, as evidenced further by a letter from the Bank subsequent to the exchange of notes in which the Bank called on the subsidiary to maintain its deposits at the agreed ratio.

In Bromfield v. Trinidad Nat. Inv. Co., 10 Cir., 1929, 36 F.2d 646, the investment company had been formed by the Trinidad National Bank. The stockholders of the two institutions, and their officers, were substantially the same. Drovers Bank, subsequently in receivership, proposed a three-cornered agreement whereby Trinidad would open a deposit account with Drovers, and Drovers would purchase notes of the investment company up to the amount of the deposit. When the receiver of Drovers sought to collect the investment company's notes in full, the investment company was allowed to set off the amount of the deposit of the Trinidad Bank. There, however, the Court stated (36 F.2d p. 647) that the facts were not in dispute; that Drovers had solicited and procured the three-cornered agreement which treated the two institutions as one for the purpose of this transaction.

Black & Decker Mfg. Co. v. Union Trust Co., 1936, 53 Ohio App. 356, 4 N.E. 2d 929, concerned an appeal from denial of the right of set-off for lack of mutuality where a parent and subsidiaries were separate entities. The Appellate Court stated (4 N.E.2d 930) that the testimony of the chairman of the board of the in-

solvent Union Trust Company established that there had been a definite understanding or agreement between the Union Trust Company and the parent corporation seeking set-off at the time that a line of credit was granted. The Court found (4 N.E.2d 931) that it was clear that the intention of the parties was to treat all three companies, the parent and the two subsidiaries, as one and as part of the same transaction.

In Love v. Vina Banking Co., 1933, 168 Miss. 321, 150 So. 754, the Supreme Court of Mississippi stated (150 So. 755) that there was "no substantial conflict in the evidence as to how the transaction was understood at the time it was entered into, and the action of the parties in reference to it."

In re Eton Furniture Co., 3 Cir., 1961, 286 F. 2d 93, concerned a furniture company engaged in manufacture in Allentown, Pennsylvania. Its general manager handled most of its business with the bank and on several occasions he borrowed money from the bank, giving his individual note and sometimes pledging his automobile for security, arranging for the proceeds to be credited to Eton's account. The sums were used by Eton for its own benefit, and when Eton's deposits produced a balance sufficiently ample, the bank appropriated Eton's funds to pay off the loans with interest. When Eton was adjudged bankrupt its trustee sought turnover of funds in the bank belonging to the bankrupt's estate, on the ground that the loans to the general manager were loans to him and not to Eton and that satisfaction of the obligations from Eton's account constituted an unjustified appropriation of Eton's funds by the bank to pay the debts of another. The referee found (and the District Court upheld his findings) that the general manager's notes were intended to be collateral security; that all of the parties so understood the transaction; that the money was in fact borrowed for Eton; that the general manager was acting for the account of and in the interest of Eton as his principal.

In re Harr, 1935 (Pennsylvania), 319 Pa. 89, 179 9 A. 238, concerned a lease. F. W. Woolworth Company had a checking account with Franklin Trust Company with a balance in excess of $50,000. Woolworth was also a tenant in the Franklin Trust Company building on a lease with an unexpired term at a rental payable in advance monthly. The lease listed as lessor the "Franklin Trust Company of Philadelphia, Agent." The lower Court allowed Woolworth to set off its obligation to pay rent against the debt due Woolworth by the insolvent Franklin Trust Company. The Court found that the Franklin Building Corporation, the principal, was organized for the purpose of taking title to the building (and other realty) to hold for the Franklin Trust Company. Woolworth's dealings had all been with the Trust Company. The Supreme Court of Pennsylvania held that the receiver of the Franklin Trust Company took the Woolworth deposit subject to performance of the terms of the lease and that until they were performed to the extent of the deposit, nothing was due from Woolworth.

None of these cases correspond in factual situation to the case before us. Absent the applicability of § 68, there is no question but that the transfer on March 19, 1962, of the sum of $54,761.64 to Inland was a voidable preference within the meaning of § 60 of the Act.

The Order of the District Court is affirmed.

Affirmed.

SWYGERT, Circuit Judge (dissenting).

Is the debtor-creditor mutuality requirement of Section 68 of the Bankruptcy Act satisfied in a parent-subsidiary corporate situation where a debtor of the parent company agrees that the latter may rely upon a setoff arrangement with its subsidiary? This is the legal question presented.

A factual question also exists: Did Sidney L. Berger, president of Berger Steel Company, agree that Inland Steel Company could rely in extending credit

to Berger Steel upon the setoff provision contained in the purchase orders Joseph T. Ryerson & Son, Inc. issued to Berger Steel?

The referee ruled that since Inland and Ryerson were separate corporate entities, no equitable setoff arose "because Inland knew at all material times that Berger Steel Company, Inc. was financing all its accounts receivable with James Talcott, Inc." Thus, the referee made no finding whether there was or was not an agreement between Berger Steel, Inland, and Ryerson that Inland could rely on the Ryerson purchase order provision as a setoff.

On review, the district judge disposed of this failure by observing that, "While it is true that the referee did not find the existence of a specific agreement [that Inland could rely upon the setoff provision], * * * this Court cannot say that the absence of such finding was clearly erroneous." In a preceding paragraph in his order affirming the referee's ruling, the district judge stated, "Assuming arguendo the legal validity of the proposition for which petitioner contends, it is clear that petitioner can not avail itself of it in the instant case, since the evidence presented to the Referee shows overwhelmingly that petitioner did not in fact rely upon the setoff provisions of the Ryerson purchase orders or the alleged representations of respondent's president."

In my opinion the evidence on this issue admits of only one finding—that Berger Steel, Ryerson, and Inland at all times understood that the setoff provision in the purchase orders was applicable to the Berger Steel account with Inland and that Inland relied upon the understanding. To demonstrate that this was the understanding between all three parties, it is sufficient merely to refer to an admission made by Sidney L. Berger during the course of the hearing before the referee. Sherman B. Hoyt, an assistant credit manager of Inland, had a telephone conversation with Berger on November 9, 1961. A memorandum of the conversa-

tion made by Hoyt was shown to Berger. The memorandum reads:

Sid Berger 'phoned.

Ryerson agreement is that they will place orders with Berger for any jobs on which Berger joists are applicable.

Advised Sid this could mean increased tonnage from Inland and a resulting credit exposure beyond that which we are willing to go.

He stated that this should not present a problem since Ryerson's orders state that any monies due them by Ryerson can be applied against the Inland account. Told him I was familiar with this set-off provision and that we would use this security for our account.

Berger stated Container Corp. job in Carol Stream will total about· $119,000.00 in billings to Ryerson.

Is still looking for some financing to help his working capital situation.

Thereupon, Berger testified as follows:

"Q. Mr. Berger, does that refresh your recollection about the conversation with Mr. Hoyt on November the 9th?

"A. Yes.

"Q. Is this substantially' true?

"A. I believe that Mr. Hoyt could have interpreted the conversation in that manner."

This evidence shows not only that Berger agreed that Ryerson could set off its debts to Berger Steel against amounts which Berger Steel owed Inland but that he understood Inland and Ryerson would rely on this arrangement.

Although Berger further testified that he did not intend to have Hoyt interpret the conversation "in the manner that would mean that Inland would have the absolute right of set off, since at that time I knew all accounts still had to be assigned to James Talcott, and Inland knew this and Ryerson knew this," it is axiomatic that undisclosed intentions that are contrary to the express words

upon which reliance is placed will not affect such reliance.

On January 2, 1962, James F. Marzano, an employee in Inland's credit department, told Berger, who had called and asked for a delay in his payments to Inland, that Berger Steel was not entitled to credit and that Inland "would have to offset future shipments through contra against his account of the monies due him from Ryerson."

On February 19, 1962, Marzano made the following contemporaneous memorandum of the conversation with Ryerson and Berger:

Phoned Ryerson to determine if the amount in billings was the figure which Berger had given us during our visit of Feb. 16.

It was determined that Berger's statement was incorrect. Ryerson was working on this and would inform us of the exact amount.

Phoned Berger to reiterate our decision of Nov. 9, which was reaffirmed on our visit of Feb. 16. We would contra the Ryerson account when it becomes available.

The final conversation between Berger and Marzano on March 6, 1962, was recorded by Marzano as follows:

Sid Berger phoned.

He stated he needed more rounds shipped.

He could not mail any payments against his account. He understood that we are to set off the Ryerson account, of which there was approximately $100,000 billed.

I indicated we could do this and hold any amounts available against the account, that we were only going to ship material to Berger based on the amount of contra security that was available.

Berger again indicated he understood this and was delivering 4 truckloads to Ryerson covering material against the Container job.

I agreed to release two trucks of rounds against this arrangement.

It is clear from the foregoing evidence that the district judge erred when he found that Inland did not rely on the setoff provision of the Ryerson purchase orders or on Berger's representations.

In my opinion the facts in the instant case are analogous to those in Piedmont Print Works v. Receivers of People's State Bank, 68 F.2d 110 (4th Cir. 1934), and Bromfield v. Trinidad Nat'l Inv. Co., 36 F.2d 646 (10th Cir. 1929). In both cases it was held that an equitable setoff was permissible because of a tripartite agreement between the bank (Peoples State Bank in Piedmont and Drovers Bank in Bromfield), the parent company, and its subsidiary, which agreement in effect treated the parent and the subsidiary as one entity. Although these were receivership rather than bankruptcy cases, the doctrine of equitable setoff there enunciated has been incorporated within the meaning of Section 68 of the Bankruptcy Act. Accordingly, the law as stated by the Fourth and Tenth Circuits should be applied to the facts of this case.

Inland extended credit to Berger Steel on the understanding that the Ryerson purchase order setoff provision could be put into effect. Berger Steel agreed. It is my view that this was sufficient compliance with the mutuality requirement of section 68.

It would seem that the majority decision is based in part on the fact that Berger had assigned its accounts receivable to James Talcott, Inc. It is my opinion that the assignment is wholly immaterial to the issue presented.

First, Talcott had constructive, if not actual, notice of the setoff provision contained in the Ryerson purchase orders. Second, and more important, the right of setoff is not qualified by the rights of other creditors, whatever their stature. Consideration of the interests of other creditors in determining whether there is a permissible setoff would read Section 68 out of the Bankruptcy Act.

I would reverse the order of the district court.