**James BLOOR, as Reorganization Trustee of IFC Collateral Corporation and Invesco Holding Corporation, Debtors in proceedings for reorganization under Chapter X of the Bankruptcy Act, Plaintiff,**

v.

**Hyman R. SHAPIRO and Ruth Shapiro, Defendants.**

No. 80 Civ. 5415 (KTD).

United States District Court, S.D. New York.

Aug. 15, 1983.

Anderson, Russell, Kill & Olick, P.C., New York City, for plaintiff-trustee; Richard W. Collins, Lynne E. Troy, New York City, of counsel.

Shea & Gould, New York City, for defendants; Martin I. Shelton, John G. Nicolich, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

The plaintiff, James Bloor, trustee in the bankruptcy of IFC Collateral Corporation and Invesco Holding Corporation, wholly owned subsidiaries of Investors Funding Corporation of New York,[1] seeks partial summary judgment against the defendants Hyman and Ruth Shapiro. The three claims here at issue, plaintiff's first, third and fourth causes of action, arise under loan guarantees signed by the defendants.

The Shapiros concede partial liability under the first cause of action; but as to the remaining claims, the Shapiro's allege that summary judgment is inappropriate given the existence of disputed issues of fact— whether the guarantees and underlying loans are conditional on the IFC Companies' performance of obligations not set forth in the written agreements. I agree in part with the defendants and will grant summary judgment only on the first cause of action.

The plaintiff also moves for summary judgment on, or, in the alternative, for dismissal of, the defendants' contractual counterclaims on two grounds: that the Shapiros lack standing to assert claims under contracts to which they are not parties and that the claims were in any event not timely interposed. Plaintiff also moves to dismiss the Shapiros' tort counterclaim for failure to state a claim upon which relief may be granted. Finally, the plaintiff moves to strike defendants' statute of limitations defense. These motions are denied in their entirety.

## I.

### FACTS

The following facts are taken from the undisputed allegations in the affidavits and exhibits submitted on this motion.

#### A. *The Grand Linwood Guarantee*

On June 1, 1973, IFC loaned about $180,-000 to the Grand Linwood Corporation, a company controlled by the Shapiros. In an agreement of the same date, the Shapiros personally and unconditionally guaranteed payment of the Grand Linwood loan. In June 1974, the parties extended the time for payment of the principal indebtedness until April 1, 1975, with monthly interest payments at a 16 percent annual rate. The Shapiros continued to guarantee all payments under the extended agreement. Grand Linwood subsequently defaulted, failing to pay interest after October 1, 1974

---

1. Since nothing in this motion turns on the identity of the particular IFC company involved on the transactions, all three companies are treated as one and referred to as "IFC."

and failing to pay the principal indebtedness by April 1, 1975. All amounts due in April, 1975 are still outstanding.

## B. *The Shaprock Guarantee*

In early 1970, Norman Dansker, the president of IFC, and Hyman Shapiro "determined that [they] could assemble properties in Fort Lee [, New Jersey,] and that [they] would build a high-rise apartment complex thereon." Total cost of the project, known as "Colony North," was to be about $75,-000,000. According to the Shapiro affidavit, "Dansker agreed that the IFC Companies would provide and obtain financing needed by the Shapiro companies to acquire the necessary parcels and to construct the improvements thereon."

Between 1970 and 1972, IFC financed the acquisition of the necessary property through ten different loans to Shaprock Corporation and Parker Palisades Associates, both Shapiro companies. Total indebtedness amounted to about $5 million. The Shapiros personally guaranteed each of the loans.

On October 17, 1972, in a writing called the "Shaprock Application," IFC agreed to provide $13 million in construction financing. In effect, this second mortgage loan was to replace a five-year $13 million second mortgage that the Chase Manhattan Bank had agreed to make in 1972. Chase's agreement to provide the loan was made expressly contingent upon IFC's agreement to provide $13 million in financing when the Chase loan expired. Since a $62 million first mortgage from the C.I. Mortgage Group was contingent upon Chase's agreement to make the $13 million second mortgage, $75 million of construction financing was in effect conditioned on IFC's agreement under the Shaprock Application. Thus, the Shapiros assert, in October, 1972

when the Shaprock Application was made, Dansker assured them that their liability under the guarantees and the liability of the Shapiro companies under the loans were conditioned on the IFC's agreement to make the $13 million second mortgage.

One month later, on November 17, 1972, the ten Shaprock and Parker mortgages were consolidated under a single agreement.[2] In an agreement of the same date, the Shapiros undertook personally "to unconditionally guarantee payment of any and all sums payable" under the consolidated Shaprock Mortgage.[3] The Shapiros assert that their liability as well as that of the Shapiro companies under the November 17 agreements was conditional, as evidenced by Dansker's assurances that repayment of the loan was subject to the condition that IFC make the $13 million second mortgage. On November 29, 1973, the period for repayment of the $2.7 million remaining due under the consolidated Shaprock mortgage was extended until January 15, 1975, at which point the entire principal balance together with accrued interest would be due. The Shapiros agreed that their obligations under the November, 1972 guarantee would remain unimpaired by the modification and extension of the loan.

In October 1974, the IFC companies became insolvent and filed petitions in bankruptcy. According to the Shapiros, it then became clear that IFC would not be able to provide the $13 million second mortgage; thus, the filing of petitions in bankruptcy constituted an anticipatory breach of the Shaprock Application. The Shapiro companies stopped making payments under the Shaprock mortgage. Chase and the C.I. Mortgage group stopped making advances under their loan agreements, and construction of Colony North came to a halt.

**2.** Shaprock conveyed the property securing the several Shaprock loans to Parker, and Parker signed the consolidated mortgage, which is, for simplicity's sake, nevertheless referred to as the Shaprock mortgage or loan.

**3.** The mortgage loans were also evidenced by notes, payment of which was also guaranteed

by the Shapiros. Copies of the notes were not submitted on this motion, and the payment terms of the notes are presumably either identical to the terms of the mortgage or not relevant to the Shapiros' obligation under the extension agreement of November 29, 1973, discussed in the text *infra*.

The Shapiros immediately attempted to obtain additional financing. In early 1975, Chase and the C.I. Mortgage Group expressed a willingness to provide additional financing, on the condition that the trustee in bankruptcy subordinate IFC's interest in the Shaprock Mortgage, in order to give the new financing superior security. The trustee refused to do so,[4] and the proposed agreement fell through. The C.I. Mortgage Group subsequently foreclosed on its $62 million mortgage. A sale of the property produced no remaining proceeds and thus eliminated the interests of IFC, the Shapiros and the Shapiro companies.

The parties allege three causes of action arising out of this fiasco. First, the plaintiff attempts to hold the Shapiros to their guarantee for the unpaid balance of the Shaprock loan, about $2.3 million, plus acrued interest. Second, the Shapiros claim, as a set-off, that IFC is liable for the ruinous consequences of the breach of its agreement to provide the $13 million second mortgage under the Shaprock Application. Third, the defendants claim, also as a set-off, that the trustee committed a *prima facie* tort under New York law when he refused to subordinate the consolidated mortgage without excuse or justification and with an intent to cause the Shapiros harm.

C. *The Bolton Guarantee*

In 1972, Dansker and Shapiro agreed to start another project. They "determined" that a parcel of property located on West 57th Street in New York City was suitable for the construction of a 48 story luxury apartment building, to be called "the Parc Vendome." They estimated that the total cost would run to about $56 million. IFC then acquired several fee and leasehold interests in the necessary property. In a contract of sale dated September 15, 1972, IFC agreed to sell these interests to Bolton, another Shapiro company. Bolton was to pay in part in cash and to take out a mortgage loan with IFC (the Bolton loan) for the balance.

In an agreement dated February 13, 1973 (the Bolton Application), IFC agreed to make a $10 million second mortgage loan to finance construction of the project. In the same agreement, Bolton authorized IFC to obtain a $46 million construction loan. Bolton also agreed to purchase the Parc Vendome property which had been acquired by IFC. At this time, Dansker assured the Shapiros that "repayment of the Bolton loan [not yet made] was conditioned upon the IFC Companies' obligation to make the $10,000,000 Second Mortgage Loan and to keep their other financing commitments for Parc Vendome." One month later, on March 20, 1973, the parties closed the Bolton contract of sale. Bolton borrowed $3.1 million from IFC as part of the purchase price, and secured the loan with a mortgage on the property. In May 1973, Vendome, another Shapiro company, entered into a construction loan agreement with Chase. Chase agreed to provide $46 million in construction financing on the condition that IFC fulfill its financing commitments.

In November 1, 1973, the parties entered into the Bolton Modification, which altered, amont other things, the repayment schedule of the Bolton loan. In an agreement dated the same day, the Shapiros gave their personal guarantee for payments under the loan.

IFC filed bankruptcy petitions in October 1974, and it became clear that the company would be unable to meet its financial commitments. Chase refused to make further advances under the $46 million loan, and construction came to a halt. The Shapiro companies made no further payments under the Bolton modification. Chase foreclosed on the property, and the proceeds of the sale were applied to its mortgage. IFC and the Shapiros thus lost their interests in the Parc Vendome.

Again, the Shapiros claim that they would have been able to finance the completion of the project notwithstanding IFC's alleged breach of the Bolton Application, if it were not for the trustee's lack of coopera-

---

4. The trustee's actions are disputed. See sec- tion III(C), *infra*.

tion. Immediately after the IFC bankruptcy, Chase was allegedly willing to provide additional financing, on the condition, among other things, that the trustee subordinate IFC's interest under the Bolton Modification to the new Mortgage from Chase. However, the trustee refused to do so, allegedly without justification and with the intent to cause the Shapiros injury. The negotiations for additional financing collapsed, and Chase foreclosed on its mortgage. Out of this failed project arises a set of claims and counterclaims identical to those discussed in connection with Colony North.

## II.

## THE SHAPIROS' LIABILITY UNDER THE GUARANTEES

### A. The First Cause of Action

The Shapiros do not dispute the trustee's allegation that they are personally liable for the Grand Linwood Corporation's default on the Grand Linwood Loan. Accordingly, I will grant summary judgment for the trustee on the first cause of action, subject to determination of the Shapiros' partial defense under the statute of limitations and their counterclaims for set-offs. *See* II(C) and III *infra*.

### B. The Third and Fourth Causes of Action

The question of the Shapiros' liability under the Bolton and Shaprock guarantees involves virtually identical issues under New York law and New Jersey law respectively. The relevant substantive law in both states is essentially the same.

■ The Shapiros assert the existence of disputed issues of fact—whether IFC's collateral agreements to provide second mortgages in excess of $10 million served as conditions precedent to repayment of the Bolton and Shaprock loans and to payment under the guarantees. To fend off this attempt to create disputes about evidence extrinsic to the written agreements, the plaintiff invokes the parol evidence rule.[5] Plaintiff contends that the case is suitable for summary judgment because the Shapiros are liable as a matter of law under the allegedly fully integrated guarantees.

■ On the one hand, it is well settled that a condition precedent to performance of terms expressly set forth in writing may be proved by parol evidence. "Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . that the writing is or is not an integrated agreement . . . ." *Restatement (Second) of Contracts* § 214 (1981). And "[w]here the parties to a written agreement agree orally that performance of the agreement is subject to the occurance of a stated condition, the agreement is not integrated with respect to the oral condition." *Restatement (Second) of Contracts* § 217. *See Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 96 A.2d 652, 657 (1953); *Procopis v. G.P.P. Restaurants, Inc.*, 43 A.D.2d 974, 975, 352 N.Y.S.2d 230 (1974); *Spina v. Ferentino*, 30 A.D.2d 1035, 294 N.Y.S.2d 721 (1968). On the other hand, it is equally well settled that extrinsic evidence is admissible only to establish terms not inconsistent with the express terms of the writing. *See, e.g., Thomas v. Scutt*, 127 N.Y. 133, 138, 27 N.E. 961 (1891); *accord Schlossman's Inc. v. Radcliffe*, 3 N.J. 430, 70 A.2d 493 (1950).

---

**5.** The plaintiff also argues that the attempt to establish a condition must fail (a) because agreement to such a condition must be set forth in writing under the statute of frauds, (b) because written agreements may not be modified by oral agreements, and (c) because modification of an agreement must be for consideration. Plaintiff's arguments are frivolous. The statute of frauds requires that certain types of agreements be evidenced by a writing, but not that the writing embody every term of the parties' agreement. The rule that later modifications to a written contract be in writing or be for separate consideration has no application to a situation where the question is whether the writing embodies every term of the parties' contemporaneous understanding. The question here is not whether the parties orally modified the loan or guarantee agreements, but whether the original agreements included the condition here at issue.

Given these rules, I agree with the plaintiff that the Shapiros may not introduce parol evidence to establish that the guarantees are in fact conditional, for the written agreements expressly provide that the guarantees are "unconditional." *See, e.g., Chase Manhattan Bank v. Kahn,* 66 A.D.2d 704, 411 N.Y.S.2d 245 (1978). Assuming, without deciding, that the same thing must be said of the underlying loan agreements,[6] this is not, however, the end of the matter.

It is also well established that several documents and agreements comprising a single agreement should be read together. *Lawrence v. Tandy & Allen, Inc.,* 14 N.J. 1, 100 A.2d 891, 894 (1953); *Mayfair Farms Holding Corp. v. Kruvant Enterprises Co.,* 64 N.J.Super. 465, 166 A.2d 585, 590 (1960), *vacated on other grounds,* 35 N.J. 558, 173 A.2d 905 (1961); *accord Nau v. Vulcan Rail & Construction,* 286 N.Y. 188, 36 N.E.2d 106 (1941). Whether "the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact." *Rudman v. Cowles,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972). The question of intent must be determined in light of all the circumstances, and not solely by reference to the terms of the agreements. *Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 770 (2d Cir.1975); *Dynamics Corp. v. International Harvester,* 429 F.Supp. 341, 346 (S.D.N.Y.1977). *Kurz v. United States,*

156 F.Supp. 99, 103–04 (S.D.N.Y.1957), *aff'd,* 254 F.2d 811 (2d Cir.1958).

Given the circumstances established on this motion, the possibility that the parties intended that the contracts be read together cannot be eliminated. The transactions which the Shapiros seek to join together were separated only by a few weeks, and they were proceeded by negotiations that appear to have gone on for some time. All the agreements appear to have been between effectively the same parties, the Shapiros and IFC. *See Mayfair v. Kruvant,* 166 A.2d at 590 (parties to the agreements need not be the same where the "several instruments were known to all the parties); *Kurz v. United States,* 156 F.Supp. at 103–04 (same). Finally, the agreements appear to have been designed to serve mutually dependent goals toward a single end, constructing two apartment complexes. Moreover, the Shapiros' view of the agreement is not incompatible with the written terms, given the nature of the total project. It may have been clear to the parties that during construction any breach of IFC's agreement to provide second mortgages would create a substantial risk that other lenders would foreclose on their loans and that, as a result, the Shapiros would lose their entire investments in the projects. It is not impossible, indeed it is undisputed for the purposes of this motion, that the parties negotiated over the allocation of this risk and agreed that in such an event the Shapi-

---

**6.** It appears that parol evidence may be admitted to establish a condition *precedent* to the effectiveness of a loan agreement which provides, without express exception, that payment shall be made by a certain date; however, the same evidence will be inadmissible to establish a condition *subsequent*—a condition which would allow forgiveness of an already effective agreement upon the occurance of a particular event. *See Hicks v. Bush,* 10 N.Y.2d 488, 491, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962); *Smith v. Dotterweich,* 200 N.Y. 299, 306–07, 93 N.E. 985 (1911); *Jamestown Business College Ass'n v. Allen,* 172 N.Y. 291, 64 N.E. 952 (1902); *Conn Organ v. Walt Whitman Music,* 67 A.D.2d 995, 996, 413 N.Y.S.2d 725 (1979); *Accord Farmers Cooperative v. Levine,* 36 A.D.2d 656, 657, 318 N.Y.S.2d 68 (1971); *accord Union Fur Shop v. Max Melzer, Inc.,* 133 N.J.Eq. 416, 29 A.2d 873 (1943); *More Game Birds in America*

*v. Boettger,* 125 N.J.L. 97, 14 A.2d 778 (1940); *but see, Restatement (Second) of Contracts,* § 217 at 142–44 (1981) (Reporter's Note: criticizing this distinction in the New York cases and suggesting that proof of the condition should be permitted whether it is a condition subsequent or a condition precedent to the effectiveness of the agreement). Although the question whether the condition urged by the Shapiros is a condition precedent or subsequent is not addressed by the parties, it appears that the defendants' view is that the failure of the condition "discharged" the obligations of the Shapiro companies under already effective loan agreements; if so, IFC's agreement to provide the second mortgages may be a condition subsequent. It is not necessary, however, to resolve this issue, since summary judgment must be denied for the reasons stated in the text.

ros would not be forced to bear IFC's consequent losses as well as their own—that the Shapiro companies would not be obligated to repay the loans and the Shapiros would not be liable under the guarantees. A trier of fact persuaded of the truth of these allegations could conclude that the parties intended that the agreements be read together.

Although I cannot rule out the Shapiros' interpretation of the "single agreement" between the parties, the existence of the alleged condition on repayment of the loans seems doubtful at this point. First, it seems very unlikely that the parties, who were represented by legal counsel during negotiations, would have omitted from the loan agreements any reference to such an important condition had they intended to include it within the terms of the loan agreements. Second, the alleged condition seems an implausible arrangement in and of itself. The Shapiros admit that had they been able to obtain additional financing, they would have been able to recoup their investments and to repay the Bolton and Shaprock loans, notwithstanding IFC's failure to make the second mortgages. In such circumstances, there would be no good reason to relieve the Shapiro companies of the obligations to repay the loans. Thus, it would be surprising if IFC agreed that its failure to provide the additional financing absolutely discharged the Shapiro companies' obligations.

 Nevertheless, such an agreement or some less extreme version of it is not impossible. Parol evidence will thus be admitted to determine whether the parties intended the agreements to be read together and to determine whether the parties intended that IFC's breach of one obligation released the Shapiros and the Shapiro companies from their obligations. Because "extrinsic evidence is admissible, summary judgment does not lie." *Lowell v. Twin Disc, Inc.,* 527 F.2d at 770.

## C. The Statute of Limitations

The defendants' statute of limitations defenses apply only to a small portion of their alleged liability under the Shaprock and Bolton guarantees.[7] Therefore, I see no point in determining the merits of these defenses before determining whether plaintiff will prevail on these causes of action. As to the Grand Linwood guarantee, plaintiff's motion to strike the statute of limitations defense is denied.

 The parties disagree about whether New York's six year statute of limitations, N.Y.Civ.Prac. Law and Rules § 213(2) (McKinney 1972) was tolled when the complaint was filed in September, 1980, or when a copy was served on the defendants in December, 1980. The statute is by its terms tolled when the action is "commenced;" the only question here is whether state or federal law determines when an action commences within the meaning of the statute. Relying on *Henkin v. Rockower Bros., Inc.,* 259 F.Supp. 202 (S.D.N.Y. 1966), the plaintiff argues that his status as trustee in bankruptcy under federal law renders this a "federal action", and that federal law therefore governs the question of when this suit was "commenced." I do not agree. In *Henkin,* the trustee in bankruptcy sued to set aside a preferential transfer. The court held that such a cause of action arose under "the Bankruptcy Act itself, rather than under state law." 259 F.Supp. at 205. Here, the trustee has brought an ordinary contract action. He is suing to collect on guarantees governed by state law, and the cause of action therefore arises under state law. The fact that jurisdiction is premised on a federal statute, in this case the Bankruptcy Act, does not convert the trustee's claims into federal claims, anymore than the diversity statute converts claims in diversity actions into federal claims. In a diversity action, the state tolling rules apply. *See Walker v. Armco Steel Corp.,* 446 U.S. 740, 750–52, 100 S.Ct. 1978, 1985–86, 64 L.Ed.2d 659 (1980); *Ragan*

---

**7.** At most, the statute of limitations defense bars recovery of payments due under the loans prior to December, 1974. The bulk of the prin-

ciple indebtedness under both loans appears to have been due after that date.

v. *Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 152 (1949). I see no reason why the trustee, who has brought a state law claim governed by the state's statute of limitations, should be permitted to escape the state tolling rules which would apply if the IFC companies had brought this suit in their own behalf.

Accordingly, I hold that the question of when the plaintiff's claims were interposed for the purposes of the statute of limitations is governed by New York state law. Under New York law, the statute is tolled not by the filing of the complaint, but by service of summons upon the defendant. N.Y.Civ.Prac.Law and Rules § 203(b)(1) (McKinney 1972). Both sides assert that the question of when, under New York law, this suit commenced is not presently appropriate for summary judgment. Accordingly, the motion to strike the statute of limitations defense is denied; further determination of this matter will await further proceedings.

### III.

### DEFENDANTS' COUNTERCLAIMS

The Shapiros have alleged three set-off claims for breaches of contract and one set-off claim for IFC's allegedly tortious refusal to subordinate the Shaprock and Bolton loans. Plaintiff moves for summary judgment on, or for dismissal of, the set-off claims on a number of grounds.

### A. *"Standing"*

■ The plaintiff argues that the Shapiros cannot assert claims based on contracts between the IFC companies and Shaprock and Bolton, because the Shapiros were not parties to these contracts.[8] Plaintiff first contends that under state law, the Shapiros as guarantors may not assert the claims of the principals, Shaprock and Bolton. *See Ettlinger v. National Surety Co.,*

221 N.Y. 467, 117 N.E. 945 (1917); *Elliott v. Brady,* 192 N.Y. 221, 85 N.E. 69 (1908). Whatever the merits of this argument in other circumstances, it fails here. Because the purpose of the rule is to protect the rights of the principal, a guarantor may assert the claims of the principal with the principal's consent. *Taylor & Jennings v. Bellino,* 57 A.D.2d 42, 45, 393 N.Y.S.2d 203 (1977); *Psaty & Fuhrman v. Continental Casualty Co.,* 278 A.D. 159, 103 N.Y.S.2d 849 (1951). *Restatement, Security* § 133(2)(a). Where the guarantor controls the principal, consent will be presumed. *Walcutt v. Clevite Corporation,* 13 N.Y.2d 48, 56–57, 241 N.Y.S.2d 834, 839, 191 N.E.2d 894 (1963) (any defense interposed by the guarantor "must be deemed to have had the implied consent" of the principal, which was controlled by the guarantor.) The defendant does not dispute the Shapiros' allegation that Hyman Shapiro is the president and sole stockholder of Bolton and Shaprock; hence, on this record, consent of the principals to the Shapiros' set-off defenses must be presumed.

■ In his reply brief, plaintiff argues, apparently as an afterthought, that the "mutuality" requirement of § 68 of the former Bankruptcy Act, 11 U.S.C. § 108 (1976), prevents the defendants from claiming breaches of the Bolton and Shaprock Applications as set-offs against the trustee's claims, because, again, the Shapiros were not parties to those agreements. Section 68 provides that "mutual debts or mutual credits" may be set off; this language has been construed to mean that "only claims to and from the same creditor and in the same capacity may be set-off." *In re Vehm Engineering Corp.,* 521 F.2d 186, 190 (9th Cir.1975). Where, however, as here, the defendant has assumed a third party's obligations to the bankrupt, and where the bankrupt had agreed that the defendant is entitled to assert the bankrupt's liabilities

---

**8.** The plaintiff also advances the argument that the set-off claims for breach of contract fail to state a claim upon which relief may be granted, since they fail to allege that the Shapiro companies satisfied the conditions precedent to IFC's obligation to provide, among other things, the second mortgages discussed in the text above. Since it is the Shapiros' contention that IFC's filing in bankruptcy constituted an anticipatory breach relieving the Shapiro companies of their obligations under the agreements, the plaintiff's argument is without merit.

to the third party, these liabilities become debts owed by the bankrupt to the defendant; such debts may be asserted by the defendant as off-sets against the bankrupt's claims. *In re Berger Steel Company,* 327 F.2d 401, 405 (7th Cir.1964) (finding no mutuality where evidence failed to establish agreement between bankrupt and respondent permitting respondent to assert as set-offs bankrupt's debts to respondent's subsidiary); *Piedmont Print Works v. Receivers,* 68 F.2d 110, 111 (4th Cir.1934) (finding mutuality where such an agreement and an "identity of interests" between company and its subsidiary were established). If the guarantee agreements entitled the Shapiros to assert the Bolton and Shaprock claims, which were closely related to the guarantees, then the trustee's liability under such claims would be debts owed to the Shapiros, to the extent of the Shapiros' liability under the guarantees. Such claims could thus be asserted by the Shapiros as set-offs. Since it appears that under state law, the guarantee agreements permit the Shapiros as guarantors to assert the claims of the principals they control even in the absence of an express contractual provision to this effect, summary judgment for the plaintiff is inappropriate in the absence of any allegation that the parties intended some contrary arrangement.

### B. *Timeliness*

■ The plaintiff argues that the Shapiros' counterclaims are time-barred under section 68 because they were not raised in a timely fashion during the bankruptcy proceedings. It has long been settled, however, that a claim "provable in bankruptcy ... may be used as a set-off or counterclaim, though the time has expired within which it could be proved." *Willcox v. Goess,* 92 F.2d 8, 16 (2d Cir.1937), *cert. denied,* 303 U.S. 647, 58 S.Ct. 646, 82 L.Ed. 1108 (1938). Although Learned Hand's *Willcox* decision preceded the Bankruptcy Act of 1937, the 1937 amendments "effected no change in the settled case-law regarding the provability and allowability of claims asserted as set-offs .... Therefore, claims which have not been proved, or which have

not been filed in time for proof and allowance, may still be used as set-offs." 4 *Collier on Bankruptcy* § 68.08, at 892 (1978); *see United States v. Columbia Erection Corp.,* 134 F.Supp. 305, 306 (W.D.Mo.1955) (a barred claim may be set up defensively in offset against a suit "even though ... the time within which the claim might be proved against the bankrupt in the bankruptcy court had expired."); *Zorwizt v. Okin,* 121 F.Supp. 56, 57 (E.D.N.Y.1954) ("counterclaims and set-offs may be asserted in the plenary suit in spite of the fact that no claims therefore were filed in the Bankruptcy proceeding, and the time to do so has expired").

■ Plaintiff also argues that the Shapiros' claims are untimely under New York and New Jersey statutes of limitations. New York law, however, clearly provides to the contrary:

> ... if the defense or counterclaim arose from the transactions, occurences, or series of transactions or occurences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

N.Y.Civ.Prac.Law and Rules § 203(c) (McKinney 1972). Thus, a defendant "may interpose, as a recoupment, any claim arising out of the same transaction, even though an independent action by the defendant on the claim would be time-barred." McLaughlin, *Practice Commentaries,* C203:9 N.Y.Civ.Prac.Law and Rules § 203 (McKinney 1972).

Plaintiff's claim fares no better under New Jersey law. "[W]here the counterclaim asserts a recoupment which is not barred by the appropriate statute of limitations as of the time *when the principal action was commenced,* it will not be considered as untimely even though it is filed in said action at a time when if it were the subject of an independent action it could not be maintained by reason of the statute of limitations." *Atlantic City Hospital v.*

*Finkle,* 110 N.J.Super. 435, 440, 265 A.2d 853 (Cty Ct.1970) (emphasis added); *see Gibbins v. Kosuga,* 121 N.J.Super. 252, 296 A.2d 557, 560–61 (Super.Ct.1972). Under New Jersey law, for the purposes of the statutes of limitations, an action "commences" when the complaint is filed. 2A N.J. S.A. § 14–1 (West Supp.1983); N.J.Civ. Prac.R. 4:2–2 (Pressler 1983). Because the complaint was filed in September, 1980, and the limitation period did not expire until October, 1980, defendants' claims are timely.

C. *The Prima Facie Tort*

In their *prima facie* tort claim, the defendants allege that the trustee, without excuse or justification, inflicted intentional harm on the defendants, resulting in damages, taking an action that would have been otherwise lawful—refusing to subordinate IFC's interest in the Shaprock and Bolton mortgages. This claim alleges all the elements of *prima facie* tort under New York law. *See Sommer v. Kaufman,* 59 A.D.2d 843, 844, 399 N.Y.S.2d 7, 8 (1st Dep't 1977). *See also Board of Education v. Farmingdale Classroom Teachers,* 38 N.Y.2d 397, 406, 380 N.Y.S.2d 635, 644, 343 N.E.2d 278 (1975).

The plaintiff's arguments for dismissal of, or judgment in his favor on this claim are somewhat obscure. Because the allegation that the trustee's actions were otherwise lawful is an element of the cause of action, plaintiff's claim that he had no contractual or other duty to subordinate the loans is irrelevant. Nor is it a defense to assert, as plaintiff does, that the defendants "are only upset at not achieving subordination." Finally, contrary to the plaintiff's assertions, the defendants have offered some amount of proof, however small, that the trustee acted with the intent to cause them harm. The defendants allege that the trustee refused to subordinate the loans; that there was nothing to be lost by subordinating the loans; that the trustee could only stand to gain by subordinating the loans, as this would enable the Shapiro companies to repay the loans; and that the trustee had no excuse or justification for his refusal. The defendants' allegation is "in sum and substance" that the plaintiff "wantonly caus[ed] damage to the plaintiff by a system of conduct on [his] part which warrants an inferrence that [he] intend[ed] harm of that type." *Advance Music Corp. v. American Tobacco Co.,* 296 N.Y. 79, 81 70 N.E.2d 401 (1946). Such allegations will survive a motion to dismiss. *Id.* Whether summary judgment should be granted is less clear, because the facts surrounding the trustee's alleged refusal to subordinate remain obscure. Plaintiff alleges that he has no recollection of such a request. Defendants' affidavits are silent on this point; they fail to set forth the precise nature of the communications with the trustee or his response, if any. Defendants simply state, in their briefs, that they have answered in response to interrogatories that they made such a request to plaintiff in plaintiff's office in the presence of witnesses and that he refused the request. Had such a request been made, plaintiff would presumably have had to seek approval for his decision from the bankruptcy court, and approval by the bankruptcy court, and approval by the bankruptcy court might foreclose a finding of malicious intent. The affidavits, however, say nothing about whether approval of the bankruptcy court was ever sought.

Given the insufficiency of the affidavits and the briefs on the question of the trustee's malicious intent, summary judgment will be denied, without prejudice to the making of a second motion on adequate affidavits and briefs from both sides.

In sum, summary judgment on the first cause of action is granted, subject to the conditions noted above. In all other respects, plaintiff's motion is denied.

SO ORDERED.