(630 P.2d 721)

No. 52,090

AETNA CASUALTY and SURETY COMPANY, *Plaintiff-Appellant,* v. HEPLER STATE BANK, *Defendant-Appellee-Cross Appellant.*

544

Opinion filed July 2, 1981.

A. J. *Wachter,* of Wilbert, Towner, Lassman, Toburen, Fleming and Wachter, of Pittsburg, for the appellant.

*Vernon D. Grassie,* of Girard, for the appellee, cross-appellant.

Before FOTH, C.J., SPENCER and PARKS, JJ.

FOTH, C.J.: This action was brought against the defendant Hepler State Bank for conversion effected through its payment of a series of checks each bearing the unauthorized indorsement of the payee.

Plaintiff Aetna Casualty and Surety Company issued an employees' fidelity bond to Columbian Hog and Cattle Powder Company. From 1973 to about July 15, 1977, Columbian employed one Ted Orton as a commission salesman to sell feed to farmers in southeastern Kansas. Orton also bought feed for his own account for use in his own livestock operations. Orton's employment agreement with Columbian called for him to make collections from customers, with all checks from customers to be made payable to Columbian. To facilitate this arrangement Columbian furnished Orton a rubber stamp reading "Columbian Hog and Cattle Powder Company," to be used to insert the

payee's name on checks from customers who might not wish to write so much.

All went well until mid-1977, when Columbian discovered that from April through June, 1977, Orton had made off with money due his employer in the amount of $5,976.96. Aetna paid this amount to Columbian, less $500 deductible under its policy, and brought this action both as subrogee of Columbian and for Columbian's $500.

Orton's method of operation was simply to stamp in Columbian's name as payee, turn the check over, stamp Columbian's name as first indorser, and then indorse the check "for deposit only, Ted Orton." The check was then deposited in Orton's personal account in the defendant bank and the proceeds used for Orton's own purposes. Checks were drawn by Orton on his account to Columbian from time to time, but no correlation was shown between those payments, the deposits of Columbian's checks, and Orton's own account with Columbian for feed purchased by him.

Aetna's original claim was based on the supposition that Columbian's entire loss had been occasioned by checks wrongfully paid by the defendant bank. At trial to the court Aetna could only show seven checks paid by defendant bank totalling $3,145.83. The result was a judgment in Aetna's favor for that amount, based on factual findings that Orton's indorsement of Columbian's name was "unauthorized" and that the bank's acceptance and payment of the checks "was not in accordance with reasonable commercial standards applicable to the banking business."

While this action was pending Aetna also attempted with some success to recoup its loss from Orton. By agreement with plaintiff's counsel Orton made periodic payments which amounted to $1,100 by the time of trial; counsel was holding that amount in his trust account. On the assumption the bank would be liable for the entire loss of almost $6,000 plaintiff agreed to offset the $1,100 against the bank's liability. When it developed the bank's liability would be only a little more than half that amount plaintiff withdrew its offer of offset and elected to apply the $1,100 solely to the debt to it from Orton. The court nevertheless at first ordered the full $1,100 to be offset. Later, on plaintiff's motion to alter or amend, it amended the judgment to allow only a pro rata offset of plaintiff's recoupment from Orton, less assumed attorney fees. Its finding was:

"On this contention, the Court finds that the judgment should be modified to reflect that attorney for plaintiff is entitled to an attorney fee of $366.00 for collection of said amount, leaving a balance of $734.00. The Court finds that plaintiff's total loss occasioned by Orton was $5,476.96, of which amount Hepler State Bank was liable for $3,145.83, or approximately 57 percent of the amount of loss sustained by plaintiff. Therefore, plaintiff is entitled to an offset of 57 percent of $734.00, or $418.38, leaving a net judgment of $2,727.45."

It also denied Aetna's claim for prejudgment interest.

Plaintiff appeals from the disallowance of interest and the allowance of the setoff. Defendant cross-appeals, contesting liability on several theories. Because they go to the heart of the lawsuit, we take up defendant's points first, although not in the order presented.

### I. "FORGERY" V. "UNAUTHORIZED SIGNATURE"

The bank contends Orton did not "forge" the instruments because he signed his own name after stamping the payee's, thus negating the intent to defraud which is an element of the criminal offense of forgery. It relies on K.S.A. 1980 Supp. 84-1-201(43) defining an " 'unauthorized' signature or indorsement" as "one made without actual, implied or apparent authority and includes a forgery." From this it argues that the Uniform Commercial Code distinguishes between a forgery and an unauthorized signature, and that without a "forgery" there can be no conversion under 84-3-419(1):

"(1) An instrument is converted when

. . . .

(c) it is paid on a *forged* indorsement." (Emphasis added.)

Courts which have faced this argument have rejected it. *Equipment Distrib. v. Charter Oak Bank, Etc.*, 34 Conn. Supp. 606, 379 A.2d 682 (1977), citing *Hartford Accident & Indemnity Co. v. S. Windsor Bank & Trust Co.*, 171 Conn. 63, 368 A.2d 76 (1976); *Salsman v. National Community Bank of Rutherford*, 102 N.J. Super. 482, 246 A.2d 162 (1968), *aff'd* 105 N.J. Super. 164, 251 A.2d 460 (1969). Their reasoning is that the three listed conversions in 84-3-419 were not intended to be exclusive. See *Commercial Credit Corp. v. University Nat. Bank, Etc.*, 590 F.2d 849, 851-52, and footnote 4 at 852 (10th Cir. 1979), and cases cited therein.

The New Jersey court, referring to the sections of the New Jersey version of the Uniform Commercial Code corresponding to our own, explained the rationale:

"Receiving the funds without a proper indorsement and crediting the funds to one not entitled thereto constitutes a conversion of the funds. A holder is one who receives an instrument which is indorsed to his order or in blank. *N.J.S.* 12*A*:1-201(20). The bank cannot be a holder, or a holder in due course (*N.J.S.* 12*A*:3-302), without a valid indorsement of this check y the estate of Arthur J. Odgers [the indorsee of the converted check]. [Citation omitted.] *N.J.S.* 12*A*:3-419(1)(*c*) provides that an instrument is converted when it is paid on a forged indorsement. *N.J.S.* 12*A*:1-201(43) provides that an unauthorized signature or indorsement is one made without authority (actual, implied or apparent) and includes a forgery. See [*Teas v. Third National Bank and Trust Co.,* 125 N.J. Eq. 224 (Ct. Error & Appeal 1939)], where the court in 125 *N.J. Eq.,* at *p.* 227 said: 'There is no substantial difference between an unauthorized endorsement and a forged endorsement, the result being the same in so far as concerns the passing of title.' The use of the word 'forged indorsement' as constituting a conversion under *N.J.S.* 12*A*:3-419(1) does not preclude the finding of conversion where the unauthorized signature does not constitute a forgery in the strict sense. If the Uniform Commercial Code fails expressly to include unauthorized indorsements other than forgeries in this conversion section, the law may reach the same result by *implication from the Code and by general principles. See N.J.S.* 12*A*:1-103, which provides: 'Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant °°° or other validating or invalidating cause shall supplement its provisions.' " 102 N.J. Super. at 492.

The general rule is summarized in 2 R. Anderson, Uniform Commercial Code § 3-419:4(d), pp. 1034-35 (2d ed. 1971):

"If the instrument is paid on an unauthorized indorsement, such act of payment is a conversion. That is to say, § Code 3-419 is to be interpreted so that payment under an unauthorized signature is a conversion even though the signature may not be a technical forgery, for the reason that with respect to the transfer of title there is no difference between a forgery and an unauthorized indorsement."

In our case we need not decide whether Orton's act of stamping Columbian's name on the back of a check was technically a "forgery." If it was unauthorized the bank was liable for conversion.

## II. IMPLIED OR APPARENT AUTHORITY

There was no evidence that Columbian ever gave Orton actual authority to indorse checks payable to Columbian. His orders were to forward all checks to the home office in Kansas City. Only if he collected cash was he to deposit it in his own account and forward his own check for the amount of the customer's payment. The bank contends, nevertheless, that Columbian must have known of Orton's practice and that the bank was justified in believing the practice was authorized.

K.S.A. 84-3-403(1) provides:

"A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority."

Kansas general agency law fits into and supplements the general code provisions. *Leaderbrand v. Central State Bank of Wichita,* 202 Kan. 450, 453, 450 P.2d 1 (1969); *Service Iron Foundry, Inc. v. M. A. Bell Co.,* 2 Kan. App. 2d 662, 671, 588 P.2d 463 (1978).

*Shawnee State Bank v. North Olathe Industrial Park, Inc.,* 228 Kan. 231, 613 P.2d 1342 (1980), summarizes well-known principles of agency and in particular implied and apparent authority.

"The law recognizes two distinct types of agencies, one actual and the other ostensible or apparent.

"The authority of an actual agent may be either express or implied. It is an express agency if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act. It is an implied agency if it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal.

"An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent." Syl. ¶¶ 1-3, p. 231.

Although what constitutes an agency is a question of law, *Fredricks v. Foltz,* 225 Kan. 663, 594 P.2d 665 (1979), resolution of conflicting evidence which might establish its existence is for the finder of fact. *CIT Financial Services, Inc. v. Gott,* 5 Kan. App. 2d 224, 229-30, 615 P.2d 774 (1980); *Hinton v. S. S. Kresge Co.,* 3 Kan. App. 2d 29, 35, 592 P.2d 471 (1978), *rev. denied* 225 Kan. 844 (1979). Thus, the trial court weighs the conflicting facts, not this court. *CIT Financial Services, Inc. v. Gott,* 5 Kan. App. 2d at 229-230, and cases cited therein. It was the bank's burden to prove the relationship. *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, Syl. ¶ 1, 548 P.2d 719 (1976).

Brady on Checks § 23.17, pp. 23-39/40 (5th ed. 1979) comments:

"Authority in an agent to sell goods for his principal does not of itself empower him to indorse checks payable to the principal which he receives, and a bank which collects checks on such indorsements will be liable to the principal if the agent misappropriates the proceeds. A bank should therefore be cautious in cashing checks or issuing its own checks or drafts for checks received by a traveling salesman.

"Neither does authority in an agent to make collections for his principal include authority to indorse checks payable to the principal. Any bank or person who receives a check on the indorsement of such an agent assumes the risk of the agent's authority. Consequently, where an agent, having authority to collect money owing to his principal but no express authority to indorse checks received in the course of his employment, wrongfully indorses a check payable to his principal and obtains money on it from the drawee bank, or some other bank, or negotiates it for value to some purchaser, and uses the proceeds for his own personal benefit, the bank or person taking or paying the check is responsible for the amount to the principal, the rightful owner of the check."

Much of what Brady says applies here. Giving Orton authority to collect checks made payable to the company exclusively pursuant to company policy and furnishing him a rubber stamp to mark in the payee's name on the check falls short of demonstrating an "implied intent" that he should have authority to indorse and cash company checks. Even assuming that at times Orton wrote checks drawn on his personal account to cover Columbian's sales to its customers, at best a conflicting evidence claim arose for the trial court's determination. Viewing the evidence in a light most favorable to the prevailing party, the trial court's findings are supported by substantial competent evidence. See *Gardner v. Rensmeyer,* 221 Kan. 23, 26, 557 P.2d 1258 (1976).

The case relied on by the appellee, *Chamberlin Co. v. Bank,* 107 Kan. 79, 190 Pac. 742 (1920), is distinguishable. There a Michigan company sent its agent into Kansas to sell weather stripping. The contracts with customers for the work did not direct payment to the company's home office but instead provided payment would be made in cash upon completion of the work. The agent took the check there in question made payable to the company, indorsed its name along with his own on the back and absconded with the funds. The court protected the bank in that instance, emphasizing payment in cash upon completion of the work necessarily implied, if a check was given in payment, the authority to cash the check. In the court's words:

"By simply taking the check to the bank and receiving cash on it he was in fact receiving 'cash on completion of the work,' the indorsement being a mere incident to and instrument for completing this simple operation." 107 Kan. at 83.

Here, the company's specific policy directed that all checks be made to the order of Columbian. From the record there is no indication any contract for feed directed payment in cash; in fact, the record leans decidedly the other way.

Finally, the bank makes some argument for apparent authority. Again no evidence in the record establishes the company ever acquiesced in or recognized those transactions wherein Orton first deposited the checks in his account and then paid the company with his own. Columbian's accounting system would not disclose whether the checks written by Orton were in payment for his own purchases or customer sales, but Columbian's manager testified to his knowledge no checks written by Orton satisfied debts from outside sales. The key here is, assuming Orton actually wrote personal checks to cover sales, did Columbian know about it? See *Senate Motors, Inc. v. Industrial Bank of Washington,* 9 U.C.C. Rptr. Serv. 387 (D.C. Super. Ct. 1971) (deciding the case on this distinction). At best, the evidence was conflicting. Columbian said it did not, the bank said it did. Viewing the trial court's decision on agency in the prevailing party's favor and rejecting the conflicting evidence, *Gardner,* 221 Kan. at 26, it cannot be said the company knowingly held out the agent as one possessing authority to indorse. *Miotk v. Rudy,* 4 Kan. App. 2d 296, 300, 605 P.2d 587 (1980).

III. FAILURE TO MEET REASONABLE COMMERCIAL STANDARDS

This issue reaches two contentions of the bank: that recovery should be precluded by Columbian's own negligence, and that it should in any event be limited to the nominal balance remaining in Orton's account.

On the first contention, K.S.A. 84-3-406 provides that one who "by his negligence substantially contributes to . . . the making of an unauthorized signature" is precluded from asserting the lack of authority against a drawee "who pays the instrument in good faith *and in accordance with the reasonable commercial standards"* of the drawee's business. (Emphasis added.) The cases uniformly hold that if payment is not in accordance with reasonable commercial standards, contributory negligence is no defense. See, *e.g., Sherriff-Goslin Co. v. Cawood,* 91 Mich. App. 204, 283 N.W.2d 691 (1979); *Mott Grain Co. v. First Nat. Bank & Trust Co.,* 259 N.W.2d 667 (N.D. 1977); *First Nat. Bank of Boston v. Hovey,* _____ Mass. App. Ct. _____, 412 N.E.2d 889 (1980); *Sea-First Bank v. Pacific Bank,* 22 Wash. App. 46, 587 P.2d 617 (1978); *Empire Moving Corp. v. Hyde Park Bank,* 43 Ill. App. 3d 991, 357 N.E.2d 1196 (1976); *Perley v. Glastonbury Bank*

*& Trust Co.,* 170 Conn. 691, 368 A.2d 149 (1976). See also 2 R. Anderson, Uniform Commercial Code § 3-406:5, p. 941; White & Summers, Uniform Commercial Code § 16-5, p. 625 (2d ed. 1980).

The second contention is based on K.S.A. 84-3-419(3), limiting recovery to the amount of any proceeds remaining in the hands of a representative guilty of conversion *if* the representative dealt with the instrument "in good faith and in accordance with the reasonable commercial standards" of the representative's business. Hence, if reasonable commercial standards of the banking business were not met this contention must also fail. *Hanover Ins. Companies v. Brotherhood State Bank,* 482 F. Supp. 501, 508 (D. Kan. 1979); *Nat'l Surety Corp. v. Citizens State Bank,* 41 Colo. App. 580, 593 P.2d 362 (1978), *aff'd*_____ Colo. _____, 612 P.2d 70 (1980).

Whether or not a bank acted in a commercially reasonable manner is a question of fact. *Continental Bank v. Wa-Ho Truck Brokerage,* 122 Ariz. 414, 595 P.2d 206 (1979); *Barnett Bank of Miami Beach v. Lipp,* 364 So. 2d 28 (Fla. Dist. Ct. App. 1978); *Holland America Cruises, N. V. v. Carver Federal Savings & Loan Association,* 60 App. Div. 2d 545, 400 N.Y.S. 2d 64 (1977); *Thorton & Co. v. Gwinnett Bank &c. Co.,* 151 Ga. App. 641, 260 S.E.2d 765 (1979).

Barring exceptional circumstances, the general rule is that failure of a bank to inquire when an individual cashes a check made payable to a corporate payee and puts the money in his personal account is an unreasonable commercial banking practice as a matter of law. See, *e.g., Hermetic Refrig. Co., Inc. v. Central Valley Nat. Bank Inc.,* 493 F.2d 476 (9th Cir. 1974); *Sherriff-Goslin Co. v. Cawood,* 91 Mich. App. 204; *National Bank v. Refrigerated & Co.,* 147 Ga. App. 240, 248 S.E.2d 496 (1978); *Belmar Truck Corp. v. Amer. Trust Co.,* 65 Misc. 2d 31, 316 N.Y.S. 2d 247, 8 U.C.C. Rptr. Serv. 73 (N.Y. Civ. Ct. 1970).

The trial court here had ample evidence to support its finding that the bank acted in a commercially unreasonable manner. The bank's act of depositing checks payable to a corporate payee into a personal checking account without inquiring as to the depositor's authority was enough. In addition, there was expert testimony from a long-time banker that the bank's actions fell short of acceptable banking practices. The trial court's finding on this issue must stand.

IV. PREJUDGMENT INTEREST

The trial court disallowed prejudgment interest on the ground that Aetna's claim was not "liquidated" until judgment was rendered. On appeal it is claimed the amount *was* liquidated because the amount of each check converted was undisputed and the total was a simple matter of addition, or "mathematical computation." Cf. *Barbara Oil Co. v. Patrick Petroleum Co.,* 1 Kan. App. 2d 437, Syl. ¶ 7, 566 P.2d 389 (1977). See also *First National Bank v. Bankers Dispatch Corporation,* 221 Kan. 528, 562 P.2d 32 (1977), and cases cited at p. 537. The bank's argument on this issue also centers on the "liquidated" vs. "unliquidated" controversy.

Both sides overlook the fact this action is for conversion, not breach of contract. In *Meek v. Railroad Co.,* 95 Kan. 111, 113, 147 Pac. 1112 (1915), we find:

"The general rule which obtains everywhere with respect to the measure of damages for the conversion of property is stated in the syllabus of *Shepard v. Pratt,* 16 Kan. 209, as follows:

" 'In actions in the nature of trover for the conversion of personal property, the measure of damages is ordinarily the value of the property at the time of the conversion, with interest thereon to the date of the verdict.' (Syl. ¶ 8.)

"(See, also, *Ball v. Campbell & Gilbert,* 30 Kan. 117, 2 Pac. 165; *Simpson v. Alexander,* 35 Kan. 225, 11 Pac. 171; *Dodson v. Cooper,* 37 Kan. 346, 15 Pac. 200.)"

*Shepard v. Pratt,* 16 Kan. 209 (1876), where the rule was first enunciated in this state, was an action for conversion of cattle. The petition claimed 225 head were converted, worth $35 per head, and prayed for $7,875 in damages. Plaintiff proved conversion of at most 100 head, worth no more than $35 each, but recovered a verdict of $3,998.81. The extra $498.81 was agreed to be interest. The court held that by pleading the exact number of cattle converted and their value per head plaintiff had pleaded a liquidated claim. Having done so, under the Code of Civil Procedure he could not recover interest without claiming it in the prayer. Had he merely pleaded a conversion, the court said, with damages in the total amount claimed, he could have had his interest because it would have been within the relief prayed for. As it was, because he pleaded his damages so specifically he was required to remit that portion of the verdict representing damages (interest) which were undoubtedly proper but which exceeded

the prayer as construed on appeal. In that case the court considered the claim "liquidated" where a number of items were alleged to be converted, each of a fixed value, even though the number converted was contested and proved at trial to be less than the number claimed.

Another instructive case is *Trapani v. Universal Credit Co.*, 151 Kan. 715, 100 P.2d 735 (1940). There the suit was for conversion of an automobile alleged to be worth $1,500. Plaintiff also claimed incidental damages of $1,000, making the total prayer $2,500. At trial the value of the car was found to be only $1,300. Judgment was entered for that amount plus several other items of incidental damages, including interest from the date of the conversion. The other items were found for various reasons to be improper, but the court held, "As to the item for interest, this is a proper element of damages in actions for conversion. (See *Meek v. Railroad Co.*, 95 Kan. 111, 147 Pac. 1112, and cases cited; also, 65 C.J. 141.)" 151 Kan. at 723. Under that case the fact that the value of the converted property is contested, *i.e.,* "unliquidated," and is determined only at trial does not prevent the award of interest on the value as finally determined. See also 18 Am. Jur. 2d, Conversion § 99; 89 C.J.S., Trover & Conversion § 171; *National Bank v. Refrigerated & Co.*, 147 Ga. App. 2d 240, 246.

The rule of these authorities is that in case of conversion interest is allowed by way of damages. The allowance is not dependent on statute nor on whether the claim is liquidated or unliquidated, but is simply designed to make the plaintiff whole. Because the owner is denied the use of either the property or its value, by analogy to the statutory interest allowed for the use of money, the rate allowable is the legal rate. *Cf. Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 449, Syl. ¶ 11, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977).

The trial court therefore erred in disallowing prejudgment interest. On remand interest at the rate of 6% should be allowed on the face amount of each check from the date of its conversion (*i.e.,* the date paid by defendant bank) until March 6, 1980, the date the original judgment was entered.

V. SETOFF

The trial court set off Orton's $1,100 partial restitution to Aetna in proportion to the amount of the total loss occasioned by the acts of Orton and the acts of the bank. Aetna complains that it had

no obligation and no intent to recover from Orton on behalf of the bank and neither it nor its attorney can be made the unwilling agent of the bank for this purpose. We agree.

It is undisputed that Columbian's total loss through Orton's defalcations was $5,976.96. Of this amount $3,145.83 was also caused by the bank's conversion of the seven checks in question, the balance by Orton's misdeeds alone. Columbian (through Aetna) could look to Orton for all of its loss and to the bank for part. It could not, of course, have full recovery from both. The bank also had a claim against Orton on Orton's warranties arising from his indorsement and transfer of the checks. K.S.A. 84-4-207(2).

Aetna pursued Orton and recovered $1,100 from him, thus reducing Orton's debt to Aetna to $4,876.96. In this action Aetna pursued the bank, seeking the $3,145.83 converted by it. We are hard pressed to see how the reduction of Orton's debt to Aetna and Columbian should reduce the liability of the bank to the same creditors. The bank has its own cause of action against Orton which it may elect to pursue, but had not done so up until the time of trial.

A closely analogous case is *Hartford Accident & Indemnity Co. v. S. Windsor Bank & Trust Co.,* 171 Conn. 63, cited in Part I above. In that case Hartford sued the bank for conversion of a $37,906 check made payable to Hartford but endorsed and deposited by an agent named Belding. After the conversion but before suit was filed, Belding sold his agency, with his successor agreeing to pay part of Belding's renewal commission on Belding's debt to Hartford in the amount of $49,547. Hartford agreed not to sue Belding while the agreement was in force, and by the time of trial had recouped $6,231. Among the bank's contentions in the conversion suit was a claim that it should have a pro rata credit, *i.e.,* the $6,231 should be applied to its obligation on the check in the ratio of the check ($37,906) to Belding's total debt ($49,547). Its claim, therefore, was for credit of $4,767, reducing its obligation for converting the check to $33,139. The Supreme Court of Connecticut made short work of the contention; Hartford had not agreed to such credit, and was properly permitted to apply the entire payment to Belding's indebtedness other than on the check. The bank was liable for the face amount.

The result is in line with the familiar rule that if a debtor owes a

creditor more than one debt, in the absence of a direction from the debtor to the creditor as to how a payment is to be applied the creditor may elect to apply it to any debt he chooses. *Edelblute v. Waddell & Reed, Inc.,* 171 Kan. 508, Syl. ¶ 3, 233 P.2d 757 (1951). Here, assuming for the sake of argument Orton's obligation to his former employer is severable, Orton could have directed its application to that part arising out of the checks cashed at defendant bank or that part arising out of other transactions. In the absence of a direction—and there was no evidence of one here—the creditor Aetna had the right to make the election.

It is true that if neither party exercises the right to determine to which debt a payment is to be applied the court may apply it "as justice may suggest." *Lumber Co. v. Workman,* 105 Kan. 505, 509, 185 Pac. 288 (1919). This is not such a case, however. When Aetna's counsel thought the bank had stipulated that Orton's entire $5,900 had gone through defendant bank, he was obliged to and did agree to offset the $1,100. When it developed the bank took a more limited view of its stipulation—*i.e.,* as being only that the *loss* was $5,900—counsel elected for his client as to the application of the money in his hands. When the court considered the matter the election had been made. In our opinion the court had no authority to change it. By the same token it could not decree a pro rata credit of any future payments by Orton, before or after attorney fees. Aetna and Columbian are entitled to recoup from Orton the gross sum of $5,976.96 less the $3,145.83 due from the bank, or $2,831.13. After that amount is collected, anything further would be received in trust and be payable to the bank.

The judgment is reversed and the case is remanded for entry of a new judgment in accordance with the views expressed herein.