**COMMERCE BANK, N.A., Plaintiff,**

v.

**CHRYSLER REALTY CORPORATION and DaimlerChrysler Corporation, Defendants.**

**No. Civ.A. 99–2017–KHV.**

United States District Court, D. Kansas.

Oct. 14, 1999.

James P. O'Hara, Andrew M. DeMarea, Shughart, Thomson & Kilroy, Overland Park, KS, for plaintiff.

Stephen M. Ryan, Michael J. Gorman, Daniels & Kaplan, P.C., Kansas City, MO, Kirkland W. Garey, Michael G. Cruse, Howard & Howard, P.C., Bloomfield Hills, MI, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Commerce Bank, N.A. has filed suit against Chrysler Realty Corporation and DaimlerChrysler Corporation, alleging conversion of collateral in which Commerce had a perfected security interest. Commerce seeks actual and punitive damages from each defendant. Defendants contend that they merely exercised contractual setoff rights under Kansas law and deny that plaintiff is entitled to damages, compensatory or punitive. This matter comes before the Court on cross-motions for summary judgment. *See Defendants' Motion For Summary Judgment* (Doc. # 31) and *Plaintiff's Motion For Summary Judgment* (Doc. # 33), both filed August 6, 1999. For reasons set forth below, the Court finds that defendants' motion should be overruled and that plaintiff's motion should be sustained in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v.*

*City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. 2505.

### Facts[1]

Commerce Bank, N.A. (Commerce) is a national banking association. Daimler-Chrysler Corporation (Chrysler) is an automobile manufacturer. Prior to its merger with Daimler–Benz, AG, Chrysler was known as Chrysler Corporation. Chrysler Realty Corporation (CRC) acquires, devel-

---

1. The parties agree that most of the facts are uncontroverted. *See Stipulation* (Doc. # 37) filed August 6, 1999.

ops, leases and sells various real estate assets which are related to the marketing functions of Chrysler. CRC is an affiliate of Chrysler.

On September 5, 1991, Chrysler and one of its retail dealers, Bierwirth Chrysler Plymouth, Inc. (Bierwirth) entered into a Sales and Service Agreement (the Dealer Agreement), with regard to the Bierwirth dealership at 6819 Johnson Drive in Mission, Kansas. The Dealer Agreement provided that Chrysler could apply to any amount which Bierwirth owed any Chrysler affiliate (such as CRC) any credit which Chrysler owed Bierwirth. The agreement also provided that if Bierwirth were to assign to a third party any credits owing from Chrysler, Bierwirth would first notify the third party of Chrysler's "first priority rights" to such credits. *See* Stipulation, Exhibit 1 at ¶ 24.

On October 10, 1995, CRC (as landlord) and Bierwirth (as tenant) executed a Dealer Lease Agreement regarding the premises of the Bierwirth dealership. The lease provided that to ensure the payment of monies due CRC for rent, taxes, insurance, repairs or monies expended by CRC on behalf of Bierwirth, Bierwirth thereby assigned to CRC all credits due or to become due from Chrysler. The lease also gave CRC the right to receive and collect any monies due Bierwirth from Chrysler. The lease required CRC to apply such funds to rent and other sums and charges due under the lease from time to time and to pay CRC's costs and expenses in exercising and continuing the assignments, including attorney fees in connection therewith. Any remaining sums were to be paid over to Bierwirth.

Bierwirth agreed that CRC's right of assignment under the lease would constitute a security interest under the Uniform Commercial Code as applicable in Kansas. Bierwirth also agreed that it would not transfer any interest in such accounts that would create an interest paramount to that of CRC, and that the breach of such obligation would constitute a default under the lease. *See* Stipulation, Exhibit 2 at ¶ 9 on pp. 8–9. CRC did not file a financing statement concerning the security interest referred to in the lease.

Two months after Bierwirth executed the lease and assignment to CRC, Bierwirth executed and delivered to Commerce a Security Agreement (the 1995 Security Agreement) pursuant to which Commerce provided inventory floor plan financing to Bierwirth. In the agreement, which is dated December 8, 1995, Bierwirth granted Commerce a security interest in all inventory, accounts receivable, contract rights and general intangibles then existing or thereafter owing to Bierwirth. On December 22, 1995, Commerce perfected its security interest in the collateral by filing UCC–1 financing statements with the Kansas Secretary of State. *See, e.g.,* Stipulation, Exhibit 4.

Some three years later, on February 4, 1998, Bierwirth executed and delivered to Commerce a second Security Agreement (the 1998 Security Agreement). *See* Stipulation, Exhibit 5. Pursuant to this agreement, Bierwirth granted Commerce a security interest in all contract rights, accounts receivable, and general intangibles of Bierwirth, whether then owned or thereafter acquired, and all proceeds of same. On February 5, 1998, Commerce perfected its security interest in this collateral by filing UCC–1 financing statements with the Kansas Secretary of State. *See* Stipulation, Exhibit 6.

On January 14, 1998, CRC sent Chrysler written notice that Bierwirth had assigned to CRC the factory receivables which were due Bierwirth from Chrysler. *See* Stipulation, Exhibit 7. Bierwirth's factory receivables included a variety of credits from Chrysler for (among other things) sales promotion incentives, warranty work and returned parts. The CRC notice stated that the assignment had been lodged because Bierwirth was $34,165.84 in arrears for rent due for December of 1997 and January of 1998. CRC requested that the factory monies be paid directly to CRC until further notice. In response, Chrysler

sent CRC four checks for factory receivables, in the total amount of $218,000.00. Commerce claims a perfected security interest in those funds.[2]

On December 16, 1997, Bierwirth agreed to sell its assets to Thomas P. Doherty on February 3, 1998. On January 26, 1998, CRC sent Bierwirth a letter which demanded that Bierwirth make certain repairs to the dealership premises. *See* Stipulation, Exhibit 10. CRC ultimately paid $196,000.00 to make the repairs on behalf of Bierwirth. On February 3, 1998, CRC and Bierwirth terminated the lease on account of Bierwirth' default. *See* Stipulation, Exhibit 12.

On May 6, 1998, Commerce faxed a letter to Chrysler, asserting that it had a perfected security interest in the factory receivables which Chrysler owed to Bierwirth. Commerce also faxed copies of the 1995 and 1998 Security Agreements and related financing statements. Commerce requested that Chrysler remit $100,-308.24.[3] *See* Stipulation, Exhibit 14. When it received this letter, Chrysler had already paid $209,000.00 to CRC by monthly checks dated February 24, March 24, and April 24, 1998. On May 11, 1998, Chrysler responded to Commerce's letter of May 6, 1998, stating that CRC had filed an assignment on January 15, 1998, "thereby preceding [Commerce's] action." *See* Stipulation, Exhibit 15. Chrysler stated that it would make payments to Commerce only upon release of CRC's assignment.

On May 14, 1998, Commerce faxed a letter to Chrysler, with a carbon copy to CRC, complaining that its interests in the factory receivables had been converted. Commerce requested pertinent documentation and an accounting by Chrysler and CFC. *See* Stipulation, Exhibit 16. Shortly thereafter, Chrysler sent CRC a final check for $13,000.00. *See* Stipulation, Exhibit 8. A few days later, on May 20, 1998,

CRC sent Chrysler a letter which removed Bierwirth from "factory assignment." *See* Stipulation, Exhibit 17.

On May 21, 1998, Chrysler faxed Commerce a letter, with copies to CRC, which stated that Chrysler had not converted any funds. *See* Stipulation, Exhibit 18. On June 11, 1998, Commerce faxed a response which renewed and made more specific its requests for an accounting and related information. The letter requested a copy of the assignment which CRC had allegedly filed on January 15, 1998 and copies of all documents that related or referred to where and how said assignment was "filed." Stipulation, Exhibit 19.

Chrysler paid CRC some $2,000.00 more than CRC was entitled to claim from Bierwirth. Although Commerce filed suit on January 15, 1999, CRC did not notify Chrysler, Bierwirth or Commerce of the surplusage. In fact, CRC did not disclose this information until the deposition of Thomas H. Noles, CRC Eastern Area Manager, on May 17, 1999. Chrysler had proceeded in reliance that CRC would act honestly and in good faith and remit any surplusage so that those funds could be remitted to Bierwirth or Commerce, its assignee.

## ANALYSIS

Although this case concerns the parties' priority rights under the Kansas Uniform Commercial Code (UCC), Commerce relies upon the legal theory of conversion. Kansas law defines the tort of conversion as an unauthorized assumption or exercise of right of ownership over goods or personal chattels belonging to another, to the exclusion of the rights of the other. *See Eckholt v. American Bus. Info., Inc.,* 873 F.Supp. 521, 524 (D.Kan. 1994); *Moore v. The State Bank of Burden,* 240 Kan. 382, 386, 729 P.2d 1205, 1210

---

**2.** The dates and amounts of the payments by Chrysler to CRC are as follows:

| | |
|---|---|
| February 24, 1998 | $ 45,000.00 |
| March 24, 1998 | $ 50,000.00 |
| April 24, 1998 | $110,000.00 |
| May 15, 1998 | $ 13,000.00 |
| TOTAL | $218,000.00 |

**3.** The $100,308.24 figure corresponds to the amount indicated on Chrysler's March 31, 1998, dealer statement for Bierwirth.

(1986), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987); *Temmen v. Kent–Brown Chevrolet Co.,* 227 Kan. 45, 50, 605 P.2d 95, 99 (1980). An action for conversion can be maintained for conversion of cash or commercial paper. *Eckholt,* 873 F.Supp. at 524; *Resolution Trust Corp. v. Overland Park Fin. Corp.,* 182 B.R. 865, 869 (D.Kan.1995); *Carmichael v. Halstead Nursing Ctr., Ltd.,* 237 Kan. 495, 500–02, 701 P.2d 934, 937–39 (1985). Likewise, a security interest can be converted. *Farmers State Bank v. FFP Operating Partners, L.P.,* 23 Kan.App.2d 712, 715, 935 P.2d 233, 235 (1997).

Conversion is a strict liability tort. *Independent Drug Wholesalers Group, Inc. v. Denton,* 833 F.Supp. 1507, 1523 (D.Kan.1993). The required intent is shown by the use or disposition of property belonging to another, and knowledge or ignorance as to ownership of the property is irrelevant. *Nelson v. Hy–Grade Constr. & Materials, Inc.,* 215 Kan. 631, 634, 527 P.2d 1059, 1062 (1974); *Farmers State Bank v. Haflich,* 10 Kan.App.2d 333, 339, 699 P.2d 553, 558 (1985). The measure of defendants' liability is the difference between the market value of the property when it was taken and the market value when it was returned, with interest.

To determine whether Chrysler and/or CRC converted Commerce's right to the Bierwirth factory receivables, the Court must examine the parties' rights under Article 9 of the Kansas UCC. *See* K.S.A. § 84–9–101 *et seq.* The broad issue is whether the bank had a perfected security interest which takes priority over the Chrysler rights in the factory receivables. Commerce asserts that under the general priority rules of Article 9, it has a perfected security interest which takes priority over any claims of Chrysler and/or CRC.

Defendants argue that under K.S.A. § 84–9–318, the rights of Commerce as assignee are subject to Chrysler's contract rights to set off the Bierwirth debts to CRC.

"The determination of priorities under Article 9 requires [the Court to] identify the respective parties within the context of Article 9." *Bank of Kansas v. Hutchinson Health Servs., Inc.,* 13 Kan.App.2d 421, 425, 773 P.2d 660, 663 (1989), *aff'd,* 246 Kan. 83, 785 P.2d 1349 (1990). In this case, Commerce is a perfected secured party. *See* K.S.A. § 84–9–105(1)(m) ("secured party" means lender, seller or other person in whose favor there is security interest, including person to whom accounts or chattel paper have been sold); K.S.A. § 84–9–303. Bierwirth is a "debtor" because it owes payment of the obligation secured. K.S.A. § 84–9–105(1)(d). Its accounts receivable constitute an "account" because they represent the right to payment for services rendered by Bierwirth (and other dealer credits).[4] Because Chrysler is obligated to pay the dealer receivables to Bierwirth, it is an "account debtor." *See* K.S.A. 84–9–105(1)(a).

Article 9 sets forth the overriding priority rule in K.S.A. § 84–9–201, which provides that "[e]xcept as otherwise provided by this act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." K.S.A. § 84–9–201. The parties agree that Commerce and Bierwirth have a security agreement which gave Commerce a security interest in the accounts receivable of Bierwirth. Commerce filed its security interest, thus perfecting it under K.S.A. § 84–9–302. Chrysler does not allege that it filed the Dealer Agreement as a security interest.

---

4. In *Citizens Savings Bank v. Sac City State Bank,* 315 N.W.2d 20, 30 (Iowa 1982), the Iowa Supreme Court held that automobile dealer holdback funds are not "accounts" within the meaning of UCC § 9–106. If part of the factory receivables in this case are not "accounts" under § 9–106, they would be intangibles. Commerce has a perfected security interest in Bierwirth intangibles, and the § 9–318 exception argued by defendants would not even arguably apply to intangibles. Because this issue does not change the outcome, the Court declines to determine whether or not some of the dealer credits, *e.g.,* other than for services rendered, might not be accounts receivable.

Thus Chrysler's interest under the dealership contract is unperfected.

K.S.A. § 84–9–312 provides the rules for resolving priorities among conflicting security interests in the same collateral, as follows:

> (5) in all cases not governed by other rules stated in this section ... priority between conflicting security interests in the same collateral shall be determined according to the following rules:
>
> > (a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

K.S.A. § 84–9–312(5). Commerce argues that under the priority rules of K.S.A. § 84–9–312(5)(a), its security interest is entitled to priority because it was first perfected. Because defendants concede that Chrysler never perfected any security interest in the Bierwirth accounts receivable, Commerce wins the priority battle if K.S.A. § 84–9–312 controls. Defendants contend, however, that the controlling priority rule is stated elsewhere, in K.S.A. § 84–9–318.

As an assignee, Commerce's right to recover on the accounts receivable is subject to the terms of the contract between Chrysler (account debtor) and Bierwirth (as assignor) "and any defense or claim arising therefrom" as well as "any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of

the assignment." K.S.A. § 84–9–318(1)(a), (b).[5] From K.S.A. § 84–9–318(1), defendants reason that plaintiff's rights as an assignee are subject to the agreements between Chrysler and Bierwirth and "any defense or claim arising therefrom," and that the bank's security interest was therefore subject to Chrysler's right to remit to CRC any credits which Chrysler owed Bierwirth. Commerce denies that defendants are entitled to any setoff under Section 9–318. Before addressing that issue, however, the Court addresses a confusing side issue about the meaning of K.S.A § 84–9–104(i), which states that Article 9 does not apply "to any right of setoff." K.S.A. § 84–9–104(i).

■ The Court agrees with the majority of courts which have found that the language of K.S.A § 84–9–104(i) must not be read too broadly. As the Eleventh Circuit Court of Appeals has well stated:

> While the language is plain enough, the conclusion that this section removes from operation of the Code any controversy between a set-off and a secured party is not warranted by the narrow purpose this provision was intended to serve.

*Griffin v. Continental American Life Insur. Co.*, 722 F.2d 671, 673 (11th Cir.1984). Professor Grant Gilmore, a principal reporter for Article Nine of the Code, believed that the exception should not have been created because "[o]f course a right of set-off is not a security interest and has never been confused with one." 1 Grant Gilmore, *Security Interests In Personal Property* § 10.7 at 315–316 ("the statute might as appropriately exclude fan danc-

---

**5.** Section 84–9–318(*l*) provides as follows:
Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 84–9–206 the rights of an assignee are subject to
(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom ...
K.S.A. § 84–318(1) subjects the rights of the assignee of chattel paper or accounts to de-

fenses of the account debtor arising out of the contract, as well as all terms of the contract, under subsection (1)(a). Kansas Comment to § 84–9–318 (1996). "A financing assignee also takes subject to the account debtor's right of setoff for defenses or claims arising out of other contracts, under subsection (1)(b), so long as the right of setoff accrues before the account debtor receives notification of the assignment." *Id.*

ing"). The bankruptcy court in *In re Otha C. Jean & Assoc., Inc.*, 152 B.R. 219 (Bankr.E.D.Tenn.1993) took a similar view:

Though a right of set-off is not a security interest, the exception in § 9–104 is worded too broadly. It says that Article 9 does not apply to a right of set-off. It would have been more accurate to say that a right of set-off is not a security interest but may be dealt with by some provisions of Article 9.

152 B.R. at 222 (quoting 1 Grant Gilmore, *Security Interests In Personal Property* § 10.7 at 315–316); *see, e.g., Bank of Kansas*, 13 Kan.App.2d at 423, 773 P.2d at 662; *In re Thompson Boat Co.*, 230 B.R. 815, 825 (Bankr.E.D.Mich.1995) (cases divided on question whether provision only removes setoff from attachment and filing provision, or whether it also renders Article 9 priority rules inapplicable; former is "better view"). Commerce argues that defendants' reliance on Section 9–104(i) is "misplaced." The Court agrees with defendants, however, that Section 104(i) simply means that an account debtor is not required to obtain a security interest or file a financing statement in order to preserve its setoff rights under common law or contract.

Defendants cite several cases for the proposition that as assignee, Commerce obtained no rights greater than those of Bierwirth, as assignor. *See Bank of Waunakee v. Rochester Cheese Sales Inc.*, 906 F.2d 1185, 1189 (7th Cir.1990); *see also Denver U.S. Nat'l Bank v. Asbell Bro's Constr.*, 294 F.2d 289 (10th Cir.1961). Defendants also cite several cases for the proposition that as a parent corporation, Chrysler was legally entitled to set off against claims by its subsidiary the amounts which Chrysler owed Bierwirth

under contract. Defendants' cases are factually distinguishable, however, and most of them do not apply the UCC. *See, e.g., Piedmont Print Works v. Receivers of People's State Bank*, 68 F.2d 110, 111 (4th Cir.1934) (receiver of insolvent bank not allowed to treat holding company and subsidiaries as two entities for purposes of setoff when bank had earlier treated them as one entity); *Inland Steel Co. v. Berger Steel Co.*, 327 F.2d 401, 403 (7th Cir.1964) (no evidence supported parent corporation's argument that tripartite agreement allowed mutual setoffs); *In re Hill Petroleum Co.*, 95 B.R. 404, 411 (1988) (dicta; if formal tripartite agreement allowed related corporations to aggregate debts, third-party setoff may be allowed); *Bromfield v. Trinidad Nat'l Inv. Co.*, 36 F.2d 646, 648 (10th Cir.1929) ("manifestly unfair" to permit failed bank to treat two related corporations as one for setoff purposes, then permit bank to later treat corporations as separate).

Commerce relies heavily upon *Bank Leumi Trust Co. of New York v. Collins Sales Service, Inc.*, 47 N.Y.2d 888, 419 N.Y.S.2d 474, 393 N.E.2d 468 (1979), and *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615 (2d Cir.1989), for the assertion that Section 9–318 does not apply to the facts of this case.[6]

In *Bank Leumi*, a bank took an assignment of Precision Graphic accounts receivable to secure a loan. Precision did business with Sesco and Collins, which were closely related corporations. Precision, Sesco and Collins agreed that if Sesco owed Precision, Precision could set off the amount of that account receivable against debt which Precision owed Collins. Preci-

---

**6.** Commerce also relies upon *Griffin v. Continental Am. Life Ins. Co.*, 722 F.2d 671 (11th Cir.1984), in which the Eleventh Circuit applied the general priority rule of UCC § 9–201 and found that a perfected security interest in receivables has priority over setoffs regardless of when the setoffs arise. *Griffin* was based on the Georgia Supreme Court's response to the following two certified questions of state law:

1. Under Georgia law does Article Nine (Secured Transactions) of the Uniform Commercial Code apply to contractual rights of set-off? YES

2. If Article Nine applies to contractual rights of set-off, does the contractual right of set-off have priority over a perfected security interest in the same fund? NO.

722 F.2d at 672.

sion defaulted on its obligations to repay the loan from the bank. Despite the agreement between Precision, Sesco and Collins, the court held that the bank was entitled to collect the accounts which Sesco owed Precision for goods sold and delivered. The court found that Sesco, the account debtor, could not assert the claim of Collins against Precision. A leading authority on Article 9 commented on the holding in *Bank Leumi* as follows:

> The court correctly held that UCC § 9–318 makes the rights of the Article 9 assignee subject only to claims and defenses of the *account debtor* against the assignor. In this case, "Y, the account debtor, had no claim or defense against X, the assignor. There was also no showing that Z's claim had been assumed by Y, even though they were related corporations." (footnote omitted).

Barkley Clark, *The Law of Secured Transactions Under The Uniform Commercial Code* (rev. ed.) ¶ 11:04[3][b] (emphasis added). Commerce therefore reasons that its rights are subject only to the claims and defenses of Chrysler, as *account debtor*, and that Chrysler cannot assert as a setoff *CRC's* claim against Bierwirth.

In *MNC*, plaintiff finance company made a loan to Ramco steel company and took a perfected security interest in its accounts receivable. Ramco filed bankruptcy and MNC, as assignee of its accounts receivable, sued Ryerson, an account debtor of Ramco. Ryerson was a wholly owned subsidiary of Inland, a steel producer. Ramco had purchased steel products from Inland on an open account. Ryerson owed money to Ramco, but had paid it to Inland on purported rights of offset of Ramco obligations to Inland. The Second Circuit found that MNC's perfected security interest in the receivables had priority over the subsequent setoff which Ryerson and Inland asserted. The purported right of setoff came from Ryerson purchase order forms, which purported to reserve the right to apply monies due Ramco to any sums which Ramco then or later owed Inland. The Second Circuit relied to a great extent on *Bank Leumi* in holding

that the contract between Ryerson and Ramco created at best "a collateral agreement [regarding] the method of payment" which did not alter Ryerson's underlying obligation. Because the setoffs arose after MNC perfected its interest in the Ramco receivables, the "first in time, first in right" rule of Section 9–312 gave MNC priority. 882 F.2d at 620.

Defendants attempt to distinguish *Bank Leumi* and *MNC*. They argue that the facts in *Bank Leumi* are distinguishable because Chrysler and Bierwirth had a prior written agreement that Chrysler could pay CRC any amounts which Bierwirth owed CRC to satisfy outstanding lease obligations. They argue that *MNC* is distinguishable because it did not involve a comprehensive written agreement which allowed the account debtor to pay its subsidiary money due the assignor. Defendants' attempt to distinguish *Bank Leumi* and *MNC* is unavailing. The Court finds that the reasoning of *Bank Leumi* and *MNC* is sound, and applies it in this case. As the Second Circuit explained in *MNC*:

> [The *Bank Leumi* case held that] Section 9–318 was inapplicable because the agreed-upon setoff was not a defense "which would negate [the account debtor's obligation to pay [the assignor]," but was merely "a collateral agreement in which the method of payment ... was established." [393 N.E.2d at 468]. The court left open the question whether a setoff would be a defense under 9–318 where an intercorporate transaction between the third party-setoff claimant [ ] and the account debtor led to the assumption by the account debtor of the third party's claim against the assignor. In those circumstances, of course, the account debtor would own the claim against the assignor. No argument is made that [the account debtor] owns the third-party set-off claimant's claim against the assignor. Viewed in the light most favorable to [the account debtor], therefore, the claimed contract with the assignor as to the setoff estab-

lished at best "a collateral agreement [regarding] the method of payment" that did not alter the [account debtor]'s underlying obligation.... The setoffs here clearly arose subsequent to the perfection of [the assignee's] security interest in [the assignor's] receivables, and the 'first in time, first in right' rule accords priority to [the assignee's] claim.

*MNC*, 882 F.2d at 620 (granting summary judgment).

Both sides also cite *Bank of Kansas v. Hutchinson Health Services, Inc.*, 246 Kan. 83, 785 P.2d 1349 (Kan.1990), as support for their positions. In *Bank of Kansas*, a nursing home secured its bank loan with accounts receivable which principally consisted of Medicaid reimbursements from the Kansas Department of Social and Rehabilitation Services (SRS). When the nursing home defaulted, the bank sought to collect the receivables. SRS, as account debtor, attempted to set off delinquent unemployment taxes which the nursing home owed the State of Kansas.[7] The Kansas Supreme Court agreed that SRS was entitled to do so under K.S.A. § 318(1)(b),[8] and although two separate departments were involved, treated the State of Kansas as a single account debtor. Although the court applied K.S.A. § 84–9–318 to allow setoffs to take priority over a perfected security interest in accounts receivable, the Court does not believe that it would do so in the facts of this case, which involves separate and distinct corporate entities.

While the Dealer Agreement between Chrysler and Bierwirth authorized Chrysler to remit the factory receivables to CRC, the Dealer Agreement in this respect merely provided a method of payment and did not create any security interest which is superior to that of Commerce.

The Court acknowledges that when Commerce took an assignment of Bierwirth accounts receivables and other assets, the assignment was subject to the terms of the contract between Chrysler and Bierwirth. Commerce's rights as assignee were not, however, subject to the terms of the lease between Bierwirth and CRC.

■ Commerce's perfected security interest is entitled to priority over CRC's unfiled security interest under the lease with Bierwirth. Chrysler and CRC have therefore converted the accounts receivable that Chrysler owed Bierwirth. As a matter of law, Commerce is entitled to recover the sum of $218,000.00.

Commerce asserts that because the measure of damages for conversion is the difference between the market value of the property when it was taken and the market value when it was returned, with interest, it is also entitled to prejudgment interest, citing *Prinz v. Moses*, 66 P. 1009, 1010 (Kan.1901). Commerce also cites *Delano v. Kitch*, 663 F.2d 990, 1001 (10th Cir. 1981), for its assertion that under Kansas law, plaintiffs are entitled to prejudgment interest on a liquidated claim. *See Delano*, 663 F.2d at 1001 (quoting *First Nat'l Bank of Girard v. Bankers Dispatch Corp.*, 221 Kan. 528, 537, 562 P.2d 32, 40 (1977)) ("A claim is liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation."). *Delano*, however, deals with contract claims. The Kansas Court of Appeals has indicated that whether a claim is liquidated is irrelevant in a conversion case:

In case of conversion interest is allowed by way of damages. The allowance is not dependent on statute nor on whether

---

7. The Court concluded that the State of Kansas was subject to the Kansas UCC.

8. The Court also found that the bank notified the State of the assignment when the bank named the state as a defendant in a (interpleader) declaratory action concerning the funds. The right of setoff accrued when the

obligation to pay the taxes was incurred, i.e. when the taxes became due and payable. The State of Kansas was entitled to the unemployment taxes that the nursing home paid before the bank gave notice of its assignment; thereafter, the bank was entitled to all of the accounts receivable. *See* K.S.A. § 9–318(1)(b).

the claim is liquidated or unliquidated, but is simply designed to make the plaintiff whole. Because the owner is denied the use of either the property or its value, by analogy to the statutory interest allowed for the use of money the rate allowable is the legal rate. *Cf. Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 449, Syl. ¶ 11, 562 P.2d 1 (1977).

*Aetna Cas. and Sur. Co. v. Hepler State Bank*, 6 Kan.App.2d 543, 553, 630 P.2d 721, 729 (1981).

■ Commerce urges the Court to find that it is entitled to prejudgment interest on the factory receivable payments as of the dates that Chrysler made the payments in question. Defendants did not respond to this argument. The Court agrees that Commerce is entitled to prejudgment interest on the factory receivables from the dates of payment, as follows.

| | |
|---|---|
| February 24, 1998 | $ 45,000.00 |
| March 24, 1998 | $ 50,000.00 |
| April 24, 1998 | $110,000.00 |
| May 15, 1998 | $ 13,000.00 |

The prejudgment interest rate is the statutory rate under Kansas law, 10 per cent simple interest. *See Aetna* 6 Kan.App.2d at 553, 630 P.2d at 729; K.S.A. § 16–201.

Finally, Commerce asserts that it is entitled to punitive damages. "In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Golconda Screw, Inc. v. West Bottoms Ltd.*, 20 Kan. App.2d 1002, 1007, 894 P.2d 260, 265 (1995) (quotations omitted); *Mohr v. State Bank of Stanley*, 241 Kan. 42, 56–57, 734 P.2d 1071, 1082 (1987) (conversion of checks where corporate officer deposited proceeds in personal account; though bank was negligent record contained no evidence that bank engaged in vindictive conduct, intentional wrongdoing, or wanton invasion of rights of plaintiff; thus award of punitive damages was reversed).

The Kansas statute provides that to recover punitive damages, plaintiff has the burden of proving by clear and convincing evidence that defendant acted with willful conduct, wanton conduct, fraud or malice. K.S.A. § 60–3702(c). In cases in which exemplary or punitive damages are recoverable, the Court may consider in determining the amount of punitive damages to be awarded:

(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected.

K.S.A. § 60–3702(b). Under K.S.A. § 60–3702(d), however, punitive damages may not be assessed against a principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer; or against an association, partnership or corporation for the acts of a member, partner or shareholder unless such association, partnership or corporation authorized or ratified the questioned conduct.

Commerce asserts that the evidence in this case supports a finding of wanton if not willful conduct by defendants. Kansas law considers an act wanton if it is performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences. *See Powell v. Havner*, 817 F.Supp. 90 (D.Kan.1993). Commerce in particular relies upon two facts: (1) that after Commerce informed defendants of its perfected security interest and its concern that its collateral was being converted, Chrysler transferred to CRC and CRC retained the final $13,000 in factory receivables, and (2) that CRC retained approximately $2,000.00 more from Chrysler than Bierwirth ever owed CRC. Defendants assert that they relied on the terms of the contracts at issue and assert that this litigation resulted from an inability to resolve purely legal issues. Defendants also point out that they offered to forward the excess $2,000.00 but that Commerce rejected their offer.

The Court finds that the evidence presents a question for the trier of fact to determine whether punitive damages should be allowed in this case. Whether defendants' conduct was willful and wanton depends to some degree on the state of mind of the actors, and the stipulated record does not allow the Court to make a summary judgment determination on this issue.

**IT IS THEREFORE ORDERED** that *Defendants' Motion For Summary Judgment* (Doc. # 31) filed August 6, 1999, is **OVERRULED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion For Summary Judgment* (Doc. # 33) filed August 6, 1999, be and hereby is **SUSTAINED** in part. The Court finds that plaintiff is entitled to summary judgment on its claim of conversion, and is entitled to actual damages of $218,000.00 plus prejudgment interest as set out above.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion For Summary Judgment* (Doc. # 33) filed August 6, 1999, be and hereby is **OVERRULED** in part. The Court finds that plaintiff is not entitled to summary judgment on the punitive damages claim, and the issue of punitive damages thus remains for trial.